[Civ. No. 3261.  Third Appellate District.—May 19, 1927.]

ERNEST W. HARKER et al., Respondents, v. SOUTHERN CALIFORNIA EDISON COMPANY (a Corporation), Appellant.

[1] NEGLIGENCE — DESTRUCTION OF PROPERTY BY FIRE — ACTION BY BOTH OWNER AND LESSEES OF DESTROYED PREMISES — PARTIES— OVERRULING OF DEMURRER — ABSENCE OF PREJUDICE—EVIDENCE.— In an action by both the owner and lessees of premises to recover damages against a power company on account of the destruction of certain property by fire alleged to have been caused by the negligence of the defendant, the action of the trial court in overruling defendant's demurrer interposed on the grounds that two causes of action were united in the complaint without separately stating them, that the causes of action were exclusively separate and that there was a misjoinder of parties plaintiff, will not warrant a reversal of a judgment in favor of the owner of the premises, where no testimony was admitted in favor of either plaintiff that would not have been admissible in actions prosecuted separately, save and except as to the value of the property destroyed, and no question of prejudice is presented, as far as any suggestion that the damages awarded the plaintiff owner are excessive, and no verdict or judgment was rendered in favor of the lessees against the defendant, nor upon the cross-complaint filed by the defendant against the lessees.

[2] ID.—VERDICT IN FAVOR OF ONE PLAINTIFF ONLY—SUFFICIENCY OF. In such action, the verdict of the jury having been in favor of the plaintiff owner only against the defendant for a specified amount, and the defendant having appealed only from the judgment entered against it in favor of the plaintiff owner, the appellate court has only to do with the judgment in favor of the plaintiff owner, and, whatever the defects of the verdict may be as to the other parties litigant, it is sufficient to show that the jury intended to and did bring in a verdict in favor of the

owner and against the defendant for a sum of money covering the damages sustained by such owner.

[3] ID. — SILENCE OF VERDICT AS TO OTHER PARTIES LITIGANT—JUDGMENT—APPEAL—WAIVER.—In such action, if the defendant desired that the jury should also find a verdict upon the losses and damages alleged to have been inflicted and sustained by the plaintiff lessees it should have made a timely request to the trial court, and likewise, if it desired a verdict or finding of the jury upon its cross-complaint against such lessees, it should have made appropriate application to the trial court, but, not having done so, and only appealing from the judgment in favor of the plaintiff owner, it is too late to raise the question of the insufficiency of the verdict on such appeal.

[4] ID. — VERDICT — EVIDENCE.—In such action, the contention of the defendant that the evidence was insufficient to support the verdict on the question of negligence of installation, maintenance, and operation of defendant's plant is not well taken.

[5] ID.—EVIDENCE—INSTRUCTIONS.—In such action, the defendant was not prejudiced by the giving of the following instruction: "You are not bound to decide in conformity with the testimony of any number of witnesses which do not produce conviction in your minds against a less number or against a presumption or inference which you may draw from the evidence satisfying. your minds" (which was claimed to be erroneous by reason of the use of the language "or inference which you may draw from the evidence satisfying your minds"), where the case presented a situation where the question was as to the inferences which might be drawn from the facts found, or from the facts testified to, rather than a determination of what set of facts was established by conflicting evidence.

[6] ID. — RES IPSA LOQUITUR—PLEADING—INSTRUCTIONS.—In such action in which the complaint alleged specific acts of negligence on the part of the defendant, the defendant was not prejudiced by the giving of a general instruction to the effect that if the fire started in the electrical equipment owned and controlled by defendant, outside of the plant owned by the plaintiff, and that the equipment in plaintiff's plant was in good condition at the time of the fire, "a *prima facie* case of negligence on the part of the defendant is shown and the burden of proving absence of negligence is cast upon the defendant," where immediately following the giving of this general instruction the court proceeded to carefully and specifically point out to the jury that no verdict could be rendered against the defendant unless they found the defendant guilty of the particular acts of negligence alleged, and it does not appear that general negligence on the part of defendant

was urged before the jury either in the introduction of testimony or in the argument of counsel.

(1) 4 C. J., p. 1169, n. 30.   (2) 38 Cyc., p. 1883, n. 74.   (3) 3 C. J., p. 865, n. 50.   (4) 20 C. J., p. 390, n. 75; 23 C. J., p. 141, n. 8. (5) 4 C. J., p. 1029, n. 30.   (6) 29 Cyc., p. 643, n. 35; 38 Cyc., p. 1779, n. 75.

APPEAL from a judgment of the Superior Court of Tulare County.   J. A. Allen, Judge.   Affirmed.

The facts are stated in the opinion of the court.

R. V. Reppy, E. W. Cunningham and Farnsworth, McClure & Burke for Appellant.

Ugene U. Blalock for Respondents.

PLUMMER, J.—Action by plaintiffs to recover damages from the defendant on account of the destruction of certain property by fire alleged to have been caused by the negligence of the defendant.   Plaintiff B. L. A. Barngrover had judgment and defendant appeals.

The complaint sets forth that the respondent Barngrover is and was at all times mentioned therein the owner of certain real property and the buildings thereon situated in the county of Tulare, state of California, commonly known and designated as the Porterville Magnesite Mill; that the plaintiffs Harker and Hoff were at the times mentioned in the complaint in the possession and occupation of the premises referred to, as the lessees of the plaintiff Barngrover, and were engaged in mining of magnesite on the real property described in the complaint; that the buildings and machinery on said property comprised a compressor plant and a blacksmith-shop.   The compressor plant, as well as the shop, was inclosed in the building; that the compressor plant and blacksmith-shop, together with the machinery and equipment therein, were in use on or about the twenty-ninth day of July, 1923, and had been in use for some time prior thereto in the operation of magnesite mining, and were so operated by the plaintiffs Harker and Hoff; that the machinery and the compressor plant were operated by means of electric motors, the motive power for which was electricity furnished under

contract by the defendant corporation; that for the purpose of transmitting electric power from the main lines owned by the defendant to the motors operated by the plaintiffs, the defendant corporation had installed certain transformers on a platform adjacent to and adjoining the building heretofore mentioned belonging to the plaintiff Barngrover and used and occupied by the plaintiffs Harker and Hoff, as her lessees; that the defendant corporation was charged with the exclusive duty of keeping its transformers, power lines, fuses, and connections between said transformers and power lines belonging to the defendant in first-class condition and repair; that the defendant corporation was on the twenty-ninth day of July, 1923, and prior thereto, charged with the sole and exclusive duty of installing and maintaining such fuses above said transformers as would adequately protect the property and equipment belonging to the plaintiff Barngrover in said compressor plant and blacksmith-shop against the high voltage carried by the defendant corporation on its power lines, from which the electric power to supply plaintiffs' needs was drawn; that said defendant corporation was likewise charged with the exclusive duty of installing and maintaining proper grounding agencies from the transformers to the earth as a safeguard and protection against possible short circuits, etc.; that in constructing and installing said transformers the defendant corporation was guilty of gross negligence and carelessness in that: 1. The transformers were improperly and insufficiently grounded to safeguard plaintiffs' property against a possible short circuit in defendant's power lines and equipment; 2. That the fuses installed by the defendant between the defendant's transformers and their electric power lines were of such size and strength as to afford inadequate or no protection to plaintiffs' property against the high voltage carried by the defendant's main power lines. That on the twenty-ninth day of July, 1923, a defect occurred in the equipment of the defendant; that said defect caused the breakers to kick out in the substation maintained by the defendant; that an employee of the defendant in charge of said breakers in said substation negligently and carelessly closed the breakers and held them closed for several minutes; that by reason of and because of said carelessness and negligence on the part of the defendant, defendant's agents,

and employees, a fire was caused which consumed and destroyed the said compressor plant and blacksmith-shop, together with the equipment and machinery therein, to the loss and damage of the plaintiff Barngrover in the sum of $8,000 and to the loss and damage of the plaintiffs Harker and Hoff in the sum of $3,000.

To this complaint the defendant demurred on the ground of misjoinder of parties plaintiff and also on the ground that the cause of action belonging to the plaintiff Barngrover was her cause of action exclusively and the alleged cause of action on the part of Harker and Hoff belonged to them exclusively and also that two causes of action were united without being separately stated. Other grounds of demurrer were alleged, which need not be mentioned. The demurrer was overruled and the defendant answered, denying all the allegations of the plaintiffs' complaint, and, in addition thereto, filed a cross-complaint against the plaintiffs Harker and Hoff wherein it alleged that the fire was caused by reason of the negligent operation of the compressor plant and that its property was destroyed thereby, to the damage of the defendant in the sum of $1,500, and prayed judgment in the sum of $1,500 against the plaintiffs Harker and Hoff.

The cause was tried before the court sitting with a jury and upon the cause being submitted to the jury for determination, the jury returned the following verdict:

"(Title of court and cause.)

"We, the jury in the above entitled action, find a verdict in favor of plaintiff B. L. A. Barngrover, and against Southern California Edison Company, a corporation, in the sum of $3800.00."

From the judgment entered upon this verdict the defendant appeals and files its notice of appeal in the following form:

"(Title of court and cause.)

"Notice of Motion to Plaintiffs.

"You and each of you will please take notice that defendant, Southern California Edison Company, hereby appeals from the judgment and from every part thereof entered against it herein on the 17th day of December, 1924, in favor of the plaintiff B. L. A. Barngrover, in the sum of Thirty-eight Hundred Dollars and costs."

Upon this appeal it is urged that the trial court committed reversible error in overruling the defendant's demurrer to the plaintiffs' complaint; also, that the evidence is not sufficient to support the verdict in that it fails to show that the fire was due to any negligence on the part of the defendant, or that the fire was the result of electrical causes; also, that the court erred in its instructions to the jury, necessitating an order of reversal.

[1] A number of cases have been cited by counsel upon the question whether there was or was not an improper joinder of parties plaintiff in this action. Upon the part of the appellant it is forcibly urged that the causes of action set forth are entirely and exclusively separate and that while the owner of the premises may have a cause of action and the lessees in the occupation and use thereof may also have a cause of action, their causes of action are not in anywise connected and the joinder thereof improper, irrespective of whether the court upon the trial of actions begun separately by the owner and by the lessees might or might not properly order them joined and tried as one, or at one time, for the reason that the evidence pertaining to the injury of one plaintiff would likewise be relevant and exactly the same testimony that would be introduced to support or controvert the claims of the other parties plaintiff. Upon the part of the respondent it is urged that there is such a union of interest as entitles the owner and the lessee to join in one action for the alleged injuries suffered by the owner and lessee of the property, by reason of the alleged negligence of the defendant which caused the simultaneous injury. We do not follow the language of the respective parties, but simply summarize their contentions.

Although the appellant in its brief asserts that the defendant was prejudiced by reason of the order of the trial court overruling its demurrer, there appears nothing in the record to substantiate this position. Our attention has not been called to a scintilla of evidence admitted in the trial court, admissible under the rules of evidence, tending to prove any of the issues that would not have been admissible in a case prosecuted for the alleged injuries by either the lessor or the lessee separately. No testimony, so far as we have been able to discover, was admitted in favor of either

plaintiff in this action that would not have been admissible in actions prosecuted separately, save and except as to the value of the property destroyed. In one case it would be the value of the property destroyed as owned and leased by the plaintiff Barngrover and in the other for the value of the use, or the value of the lease owned and possessed by the plaintiffs Harker and Hoff. Here again no question of prejudice is presented, as far as any suggestion that the damages awarded the plaintiff Barngrover are excessive. Under such circumstances section 4½ of article VI of the state constitution directly applies, wherein it provides that no error of the trial court in its rulings as to any matter of pleading or error of procedure shall be sufficient to authorize a court to set aside a judgment, or grant a new trial, unless the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. The application of this section of the constitution to the case at bar is also enforced by the fact that no verdict or judgment was rendered in favor of the plaintiffs Harker and Hoff against the defendant, nor upon the cross-complaint filed by the defendant against the plaintiffs Harker and Hoff. The case in its ultimate analysis and final result is as though a separate action were begun and prosecuted by the plaintiff Barngrover against the defendant. For this reason any ruling by this court upon the correctness or incorrectness of the order of the trial court in overruling the defendant's demurrer would be mere *dicta* as not being necessary to a decision of this cause.

[2] Though not in the order of presentation, it is here pertinent to consider the form and effect of the verdict which appellant alleges to be insufficient. In the case of *Benson* v. *Southern Pac. Co.*, 177 Cal. 777 [171 Pac. 948], the supreme court had before it a verdict which failed to mention all the parties. It was there held: "A verdict against one of two defendants is not a verdict in favor of the codefendant as to whom it is silent, but as to the latter it is merely a failure of the jury to find upon the issues." To the same effect is *Benjamin* v. *Stewart*, 61 Cal. 605. In the case of *Asebez* v. *Bliss*, 178 Cal. 137 [172 Pac. 595], it was held that under the provisions of section 619 of the Code of Civil Procedure, where a party failed to ask that the defect in the verdict be remedied, if any defect existed, the defect was waived, citing *Van Damme* v. *McGilvray*

*Stone Co.,* 22 Cal. App. 191 [133 Pac. 995]. This case is
also cited in *Benson* v. *Southern Pac. Co., supra.* See, also,
as to failure of a party to call the attention of the trial
court to alleged defects and a failure so to do, *City of
Guthrie* v. *Thistle,* 5 Okl. 517 [40 Pac. 1003]; *Vater* v. *Lewis,*
36 Ind. 288 [10 Am. Rep. 29]; *Bradley* v. *Bradley,* 45 Ind.
67, 72. Again, the appeal which the appellant has taken
in this case, as appears from the notice of appeal, which
we have hereinbefore set forth, raises only the question of the
sufficiency of the judgment in favor of the plaintiff Barn-
grover, and being so limited, we have only to inquire as to
whether the verdict is sufficient in form and substance to
support the judgment for said plaintiff. That the other
plaintiffs were not awarded judgment and that the defendant
was not awarded any judgment upon its cross-complaint are
not questions tendered to us upon this appeal. We have only
to do with the judgment in favor of the plaintiff Barngrover,
and, whatever the defects of the verdict may be as to the
other parties litigant, it is certainly sufficient to show that
the jury intended to and did bring in a verdict in favor of
the plaintiff Barngrover and against the appellant for a sum
of money covering the damages sustained by her, nowhere
alleged or claimed by appellant to be excessive, and, there-
fore, not prejudicial to the appellant in any particular, if the
testimony authorized a finding of the jury that the fire was
caused by the defendant's negligence. A mistrial as to the
other parties litigant does not compel a new trial as to the
plaintiff Barngrover. [3] Under the California cases which
we have cited, if the appellant desired that the jury should
also find a verdict upon the losses and damages alleged to
have been inflicted and sustained by the plaintiffs Harker
and Hoff it should have made a timely request to the trial
court. Likewise, if it desired a verdict or finding of the
jury upon its cross-complaint against the plaintiffs Harker
and Hoff it should have made appropriate application to the
trial court, but, not having done so, and only appealing from
the judgment in favor of the plaintiff Barngrover, we must
hold that it is too late to raise the question here.

As stated in the beginning, an analysis of the proceedings
in this cause show that in the final conclusion thereof it
must be held simply an action begun and prosecuted by the
plaintiff Barngrover to judgment, to the same effect as

though the plaintiffs Harker and Hoff had not been named in the complaint, and to the same effect as though the appellant had not in the action filed and presented a cross-complaint against the plaintiffs Harker and Hoff. For the purposes of this appeal we think all of these matters may be considered as surplusage and the rights of the plaintiff Barngrover and the responsibility of the defendant corporation considered as though Harker and Hoff had never been joined as plaintiffs and as though the defendant corporation had never filed a cross-complaint against them.

[4] This brings us to a consideration of the merits of the controversy between the plaintiff Barngrover and the defendant. First, does the evidence sustain the verdict? Before answering this question by setting out the substance of the testimony, we may preliminarily state that the buildings in which the machinery referred to was situated were built upon a high hill or mountain, which apparently was devoid of moisture near the surface; that in the installation and operation of the appliances necessary and requisite for furnishing power to the electrical motors operating the compressor plant, ground wires were necessary to be installed to afford protection against a possible overload of the defendant's wires; that in order to install the proper ground wires it was necessary to have the wires in some manner connected with moisture. In the instant case it appears that the defendant installed its ground wire by placing a metal plate some two or three feet in the earth and connecting its ground wire therewith. The testimony is to the effect that the main power line maintained and operated by the defendant carried a voltage of 11,000 volts; that before this electric energy was delivered to the plaintiffs it was reduced to 220 volts. It also appears that it was necessary in preventing the 11,000 voltage carried by the main line from being communicated to the secondary line, or the line carrying only the lesser voltage, fuses were installed; that for these fuses to operate efficiently they should not be of greater strength than would admit of their blowing out before the high voltage on the primary line could be communicated to the secondary line intended only for a lesser voltage. The complaint sets forth that the fuses installed by the defendant were of too great strength to afford protection, or to express it in other words and to convey the

meaning, that they were of sufficient strength to admit of the carrying of a dangerous voltage from the main line to the secondary line, or from the main side of the transformers to the secondary side of the transformers. The transformers installed by the appellant were situated upon a platform slightly elevated and arranged in pairs of three on each side of the platform. All of these transformers were not used at one time, however. The plaintiffs operated a 30 horse-power motor in the operation of the compressor plant. It is the contention of the plaintiffs that the starters would have to be switched over to what is called a running position before the compressor plant could be brought up to an 85 or 95 pound pressure; that it was necessary to maintain a pressure of this degree before the drills used in mining could be operated. It is the contention of the plaintiff that the fire started in the equipment owned and exclusively under the control of the defendant, by reason of defects therein, as alleged in the complaint, or, in other words, by reason of the installation of defective equipment. In the early stages of the fire there was only one witness, a gentleman by the name of E. S. Smith. This witness stated that he was going up to the compressor plant on the morning of the fire; that the first thing he saw was a cloud of smoke arising approximately 200 feet in the air; that when he got to the compressor plant house the roof of the compressor plant was on fire; that the transformers were afire and the electric pole was afire at the top; that he left his truck a short distance from the compressor-house and went around the house into the tool-shed; that he did not remember whether he first went into the tool-shed or the compressor-house, but that he thought he went into the tool-shed first; that the walls of the compressor-house were not on fire; that there was no fire inside; that the switch-board in the compressor-house was not on fire; that the transformers were on fire and the electric pole was on fire; the electric pole was approximately 10 feet from the transformers. It may be here stated that the testimony shows the installation of fuses on the electric pole. The witness stated that he knew the whereabouts of the switchboard in the compressor plant; that he remained in the compressor-house just a short time; that the partitions between the blacksmith-shop and the compressor-house were not on fire; that water was running through the com-

pressor; that the compressor was not running at the time the witness entered the compressor-house; that the transformers all lay on the ground after the fire; that they dropped away from the compressor-house.

The plaintiffs' contention that the fire did not start in the compressor plant is supported by the cross-examination of one of the defendant's witnesses. We quote the following: "Q. So in order for the fire to have started because of the handle of the switch being in the starting position, that switchboard must, necessarily, have been on fire before the transformer. Is that right? A. Not necessarily. The insulation on the wires could be on fire before the switchboard took fire. Q. It would be seen very readily? A. Yes sir. Q. Then repeating my question again: For the fire to have started in the equipment of the plaintiffs, it would necessarily—this board from the insulation from above this starter would have been on fire before the transformers were on fire? A. Yes. Q. If the fire did not start there, then the fire did not start in the plaintiff's equipment. Is that right? A. Yes sir."

The testimony of the witness Smith just set forth was to the effect that the switchboard was not on fire and that the switchboard in the compressor plant was not on fire, and that the transformers were at the time he entered the compressor plant buildings. There is also testimony to the effect that the transformers contained insulation and oil which would cause a very black smoke, as testified to by the witness Smith. There was also testimony to the effect that a short circuit tends to show either improper equipment of the defendant's appliances or of improper equipment of the plant. One of the witnesses, after testifying as to the possibility of an explosion in the transformers, testified as follows: "Q. Isn't it a fact within your experience, that transformers sometimes burn up without any defect occurring, or without any short circuit occurring in the consumer's equipment? A. Yes, sir. Q. How can those fires be caused? A. The insulation of the transformer itself burning. Q. Couldn't that have happened in this case? A. Yes, sir. Q. And allow 11,000 volts to go into the starter? A. No; because I didn't see any evidence in there that it did get over there at all. Q. But it could do so? A. It could do it, sure. Q. You testified that the

primary and secondary coils in one transformer were together? A. Yes sir."

This testimony shows that one of the transformers was on fire on the inside; also, as we have said, it accounts for the color of the smoke being black. The burning oil in the transformers would necessarily give that color to the smoke.

Evidence was introduced by the plaintiff showing that on the morning of the fire, and for a short time preceding, the compressor plant was running in a normal manner, that the drill being operated required an air pressure of at least 75 pounds. There was also testimony that the equipment of the compressor plant had been inspected a short time previous to the fire, just how long does not exactly appear, but the fact that the equipment was operating normally preceding the fire and that the plaintiffs' equipment was not on fire at the time the building was entered by the witness Smith, at which time the compressors were on fire and, also, a certain pole on which the wires were brought down to the compressor plant was on fire lays a sufficient basis for the jury to conclude that the fire was not the result of any defect in the electrical equipment of the compressor plant, even though the inspection referred to was made some little time preceding the fire. There is also testimony to the effect that approximately a month preceding the fire additional ground wires were put in connecting the compressor plant with waterpipes and that this connecting with moisture constituted a proper equipment or installation of ground wires. It may be here stated that all the testimony shows that a ground wire to be efficient and to afford protection must be connected with moisture. The testimony shows that the strength of the fuses employed were 30 amperes; that some time previous to the fire the fuses had been blowing out and the heavier or 30 ampere fuses were installed. There was also testimony to the effect that where 30 ampere coils or fuses were in use, the circuit-breakers would be normally set at 30 amperes. The circuit-breaker is supposed to kick out when an overload occurs, or a defect occurs in the system. It would appear from the testimony and the jury would be justified in concluding that if the fuses or coils installed are too large, the circuit-breaker would kick out before the fuses would give way, or blow up, as the expression is used in the testimony.

The witness in general charge of the defendant's sub-station on the morning of the fire testified as follows: That after he saw the fire up on the hill he went to the substation; that it was about 8:02 or 8:03 A. M. in the morning, by the substation clock; that when he got to the door, a bell was ringing, which indicated that the breaker was out; that the bell rings when the breaker is out of order, attracting the attention of the operator; that the operator was in the back yard; when he came in he said it was the magnesite circuit (meaning the circuit connected with the plaintiffs' plant). The witness further stated that the breaker kicked out twice, the operator stating that the first time it kicked out was 8:01; that the breaker was pushed back in place; that a short circuit would cause the breaker to kick out; that the closing of the breakers would shift the 11,000 volts back on the line.

This witness did not know at what amperage the breaker was set; that they had arranged for setting breakers; that there was a special man from the department who set the breakers; that they had what was considered about 30 ampere current coils; that if a transformer was overloaded and the fuses did not blow out, the current would go back to the substation and usually kick out the circuit-breaker; that when the breaker kicked out, there would be no alternating current on the line. The witness stated that he was pretty sure the breaker kicked out that morning, as he saw a record of the station afterward; that he did not remember whether the breakers opened more than once. There was testimony that 30 ampere fuses would carry approximately 400 horse-power; that 50 horse-power was all that plaintiffs used at any one time. There was further testimony that 30 ampere fuses would support between 430 and 440 horse-power; that the compressor plant was equipped with two motors totaling 80 horse-power. This testimony was presented to the jury in order that it might conclude that the fuses were from two to two and one-half times as strong as necessary. There was testimony to the effect that the maximum starting horse-power used was from 125 to 150 and that if both motors were used the demand would be from 185 to 210 horse-power. From this it is argued, and it appears that the jury would be entitled to conclude, that if the fuses installed and maintained by the defendant between the

main power lines and the transformers had been of the correct amperage, the minute a short circuit occurred they would have blown out and the full power of 11,000 volts carried on the defendant's main lines would have been completely cut off, but that, instead of the fuses blowing out, the breakers set at 30 amperes in the substation were caused to kick out and that if the fuses had not been so great they would have blown out before the kick occurred, that the overload would not have been carried, in which case there would have been no fire. As heretofore stated, the fire occurred on the twenty-ninth day of July. The scene of the plant was on the top of a mountain. That whether a plate ground was used or a driven ground in order to operate properly, moisture must be reached. There was also testimony that defendant's equipment was of such a character that a ground was necessary for the proper protection of their own and plaintiffs' plants. In this connection the witness Hamilton, heretofore referred to as having general charge of the defendant's substation, testified: The character of the soil on top of the hill was a rocky formation, dry on the surface; that he did not know how far down it was dry; that he dug down two feet; that it was dry for the two feet; that so far as he knew it was dry all the way down; that he stopped digging at two feet because the handle of the shovel he was using was burned and it was not easy to dig; that when it got down two feet he found the wire imbedded in the earth; a No. 2-0 strand wire; that he did not take up the anchor plate; that he did not know that there was a plate there; that as a matter of fact he did not know how the transformers were grounded. There was further testimony that it was a serpentine green rock, the same alternating to a brown color on the top of the hill; that there were but a few inches of soil on the top; that it was absolutely barren rock; that the plate to which the ground wire was attached was down approximately two or three feet. This evidence as to the character and condition of the soil on the top of the hill where the plant was situated on the twenty-ninth day of July was competent for the jury to consider in determining whether the defendant's plant was or was not properly grounded. In this connection we may revert to the argument of the appellant that the grounding system must have been efficient, else a fire would have oc-

curred previously. This overlooks the well-known climatic conditions prevailing in the state of California and in the section of the country where the premises under consideration are located. The twenty-ninth day of July is ordinarily a considerable period of time after the dry season has begun in California, and we think from the facts stated that the jury had a right to consider that the location of the plant upon a high and dry hill would affect the character of the grounding system, and that as the moisture disappeared with the advance of the dry season, a grounding system depending upon a plate close to the surface which would operate efficiently during the rainy season would cease to be efficient when the soil became barren of moisture and the efficiency would lessen substantially with the advance of the dry season. These are commonplace matters which do not need to be told a jury and are elements entering into and to be taken consideration of in the installation of an effective grounding system. The evidence, so far as any exploration appears to have been made of the place where the defendant's grounding system was installed, is to the effect that there was no moisture and we think justified the jury in coming to the conclusion that the plate to which the grounding wire was attached rested in dry ground.

There was also testimony to the effect that the motors in the plaintiff's plant were not burned by electricity, but were burned by external heat. There was also testimony to the effect that by reason of the equipment maintained by the defendant the 11,000 volts were sent directly into the plaintiffs' starter; that this resulted from the primary and secondary wires coming into contact. There was also evidence to the effect that the wires from the transformers, which entered the plaintiffs' buildings, entered through the side, and that portion of the building which was first described as being on fire by the witness Smith, when he first reached the plant when it was on fire. There was also testimony to the effect that the starting switch or handle was in starting position in the plaintiffs' plant after the fire and also that the springs which would hold the switch out of position were burned or weakened by the fire so as to permit the switch or handle to come back into a starting position. There was also considerable testimony introduced that the plate used by the defendant in its grounding system would

be efficient if imbedded in moisture, but we have had our attention called to no evidence indicating the condition of the ground where the plate was imbedded, other than that to which we have referred, which we think justified the conclusion of the jury that the grounding system maintained by the defendant was not efficient and did not afford proper protection. A great deal of technical testimony was introduced which we have not set out, from which the jury might have reached a different conclusion, unless very carefully scrutinized, for, as it appears to us, it was based largely upon assumptions such as if the ground plate were in moisture it would afford the necessary protection; if the coils were of the proper size they would blow out; if the kick-out occurred in the substation the current would be off the line and remain off unless the breakers were closed. There appears to be some difference as to the time when the fire occurred; the witness who first visited the plant and discovered the fire testified that he started toward the plant at about 20 minutes to 8 and consumed some minutes before he came in sight thereof. On the part of the defendant the testimony as to the time is that of the person in general charge who was told the time of the first kick-out in the breaker by the operator in charge and that at the time of the second kick-out, which was two or three minutes after 8, the plant was on fire.

A great deal of testimony was introduced concerning the condition of wires, evidence that the plant burned down and theories advanced based thereon, but it would serve no useful purpose to recount the same here, as it does not affect materially the testimony which we have hereinbefore referred to, and while no actual witness saw the beginning of the fire, we think the testimony taken as a whole justified the jury in coming to the conclusion that the fire resulted from the improper equipment, as alleged in plaintiffs' complaint. The evidence in this case is really not conflicting in the true sense of the word; the opinions, theories, and conclusions drawn from the evidence show only a difference. There is no conflict as to the size of the fuses, no dispute as to the 11,000 volts carried, as to what would happen if the 11,000 volts on the main line were transmitted to the secondary wires, no controversy as to ground wires being necessary to afford pro-

tection, although there was testimony that the plant would operate without ground wires. The testimony introduced by the defendant concerning fuses, coils, and ground wires in the plaintiffs' plant was shown to be of no value when the witnesses testified to the condition of certain wires found after the fire started, that he did not know whether they were the wires used by the plaintiff, which testimony was followed by a witness on the part of the plaintiff, who testified that the defective coils and wires used by the plaintiff were discarded coils and wires and were. not used at the time of the fire.

From the foregoing we must hold that the contention of the appellant that the evidence is insufficient to support the verdict on the question of negligence of installation, maintenance, and operation of the defendant's plant is not well taken.

[5] It is finally contended that the court erred in the giving of certain instructions to the jury and that this error on the part of the court resulted in a miscarriage of justice. The instruction given by the court at the request of the plaintiff first called to our attention is as follows: "You are not bound to decide in conformity with the testimony of any number of witnesses which do not produce conviction in your minds against a less number or against a presumption or inference which you may draw from the evidence satisfying your minds."

Subdivision 2 of section 2061 of the Code of Civil Procedure permits juries to be instructed on all proper occasions that they are not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds against a less number, or against a presumption or other evidence satisfying their minds. The change in the instruction from the wording of the code is in that following the word "presumption." In the instruction this language is used: "or inference which you may draw from the evidence satisfying your minds," instead of "or other evidence satisfying your minds." In support of this contention that the wording of the instruction as given to the jury is erroneous, appellant relies upon the case of *Everett* v. *Standard Acc. Ins. Co.*, 45 Cal. App. 332 [187 Pac. 996], where it is said: "Unless these pre-

sumptions were controverted by other evidence, the jury was bound to find according to the presumption. (Sec. 1961, Code Civ. Proc.) If controverted by other evidence the presumption itself is to be treated as evidence conflicting with the other evidence offered. Otherwise there would be no need of using the word 'other' in the code section cited. Thus, the presumption of innocence of crime will support a verdict of acquittal in a criminal case though no evidence is offered to controvert the case of the prosecution. The rule differs as to an inference which can be drawn only from facts proved. Where evidence is offered controverting the inference which might ordinarily be drawn under the circumstances, the jury is bound to find according to the controverting evidence. The distinction is found in the code. Section 1958 of the Code of Civil Procedure defines an 'inference as a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect.' Section 1959 defines a presumption as 'a deduction which the law expressly directs to be made from particular facts.' " Assuming, without deciding, that the foregoing is a correct statement of the law relative to the use of the word "inference" in the instruction, and that the court should have followed the wording of the statute, instead of using the language which it did, it does not follow that any prejudice has resulted in this case. The evidence in this case is such, as we have hereinbefore stated, is conflicting not in its character so much as in the inferences which may be drawn therefrom. This case presents a situation where the question is as to the inferences which may be drawn from the facts found, or from the facts testified to, rather than a determination of what set of facts is established by conflicting evidence. Under such circumstances, it does not appear that any reversible error can result or has resulted from the giving of the instruction, as worded by the court. It would be well, however, for trial courts in giving instructions provided for by section 2061 of the Code of Civil Procedure to follow exactly the language of the code.

[6] Appellant also argues that the court erred in giving to the jury the following instruction: "If you find from the evidence adduced in this case that the fire started at a

point in the electrical equipment owned and controlled by the defendant, outside of the plant owned by the plaintiff Blanche L. A. Barngrover, and that the equipment in said plant owned by said plaintiff was in good condition at the time of said fire, a *prima facie* case of negligence on the part of the defendant is shown and the burden of proving absence of negligence is case upon the defendant.'' The point is raised against this instruction that it applies the doctrine of *"res ipsa loquitur"* in a case where the appellant relies upon specific acts of alleged negligence and not upon an allegation of general negligence, or of negligence alleged in general language. The respondent supports this instruction by citing the case of *Silva* v. *Northern California Power Co.*, 32 Cal. App. 139 [162 Pac. 412]. In that case the allegations in the complaint were to the effect that the wires, appliances, and apparatus referred to connecting with and extending from the power line to the place where the wires entered the tank-house belonging to the plaintiff and used by the defendant in supplying power prior to the fire referred to, defendant ''negligently and carelessly allowed the same to be and remain, and by reason of said negligence they became, and were, in such condition as to admit a dangerous amount of voltage of electricity to said wires in said tank-house and thereby to render them dangerous and unsafe with respect to causing fire in said tank-house.''

In considering the question of negligence as to the installation and maintenance of the apparatus just referred to and of the office of insulators, the court said: ''The office intended to be performed by these circuit breakers and insulators on defendant's wires at the point of connection with the wires going inside, was to control the current or prevent its doing damage in passing into the building. It further appeared that after the wires fell to the ground the ends were brought together and caused a spark showing that the current was then passing from the transformer over these wires. It appeared that the wires were insulated where they passed through the walls of the building and were at the time in place, and, so far as known, in good condition. And the evidence was that the fire did not start elsewhere than on the outside and at the point of connection as already explained. The evidence was that the fire could

not have been caused by any agency other than the electricity passing from the transformer. And as the fire started at a point on the wires admittedly owned by and in the control of defendant, we think sufficient was shown to make a *prima facie* case of negligence on the part of defendant and to cast upon defendant the burden of excusing its negligence.''

In the case at bar the evidence is direct that there was no fire where the wires entered the side of the building covering the plaintiffs' compressor plant; it is also direct that there was no fire in the motors or in any part of the apparatus controlling the operation of the compressor plant or mechanism; that the fire then existing in the compressor plant was burning the paper roof of the building and that the wires which went into the side of the building did not communicate or were not in contact with the paper roof that was on fire. The testimony is also direct that at the time of the arrival of the first witness, who reached the scene of the fire, the transformers were on fire; that the smoke was mounting therefrom approximately 200 feet into the air; that the pole from which the wires were brought down to the compressor plant was on fire, and, also, there is sufficient in the testimony to justify the conclusion that the burning oil in one of the transformers was sufficient to spread the fire to the plaintiffs' buildings. In the case at bar it is not admitted by the defendant that the fire started in the transformers or on the pole down which the wires were brought and on which fuses were installed by the defendant, but the evidence which we have referred to amply justifies the conclusion that the fire started in that portion of the plant under the exclusive control and superintendence of the defendant, nor is there any evidence in the record indicating that the fire was caused by any other agency than the electricity carried on the defendant's power lines and conducted through the transformers. In the case of *Marovich* v. *Central Cal. Traction Co.*, 191 Cal. 295 [216 Pac. 595], the question of whether an instruction applying the doctrine of *res ipsa loquitur* should be given, we find the following: ''The general rule is that where the plaintiff in his complaint gives the explanation of the cause of the accident, that is to say, where the plaintiff instead of relying

upon a general allegation of negligence, sets out specifically the negligent acts or omissions complained of, the doctrine of *res ipsa loquitur* does not apply.'' (*Connor* v. *Atchison, T. & S. F. Ry. Co.*, 189 Cal. 1 [22 A. L. R. 1462, 207 Pac. 378]), and continuing, '' 'The foregoing statement of the rule in the cited case was followed by the qualification that where the explanation leaves it doubtful as to whether or not the ultimate cause of the injury is the negligence of the party charged, it is proper to instruct the jury as to the *res ipsa loquitur* doctrine.' Regardless of the effect of the foregoing qualification upon the general rule, it is clear that where the plaintiff in his complaint makes no general allegation of negligence, or no allegation of general negligence, instructions applying the doctrine of *res ipsa loquitur* should not be given. This must be so for the reason that in such case the plaintiff can recover only upon proof of one or more of the specific acts or omissions alleged in the complaint,'' citing a number of cases.

Had the case been submitted to the jury simply with the general instruction, which we have above quoted, we think reversible error would have been committed. Immediately following the giving of this general instruction the court proceeded to carefully and specifically point out to the jury that no verdict could be rendered against the defendant unless they found the defendant guilty of the particular acts of negligence alleged, as shown by the following instructions, which we quote:

### Instruction No. 8.

''You are instructed that the mere fact of the accident and consequent injury to the property of plaintiffs raises no presumption of negligence, but the plaintiffs must show by independent evidence that the accident was due to want of ordinary care on the part of the defendant and without any contributory negligence on the part of plaintiffs or their employees.''

### Instruction No. 12.

''The plaintiffs have charged that the defendant was guilty of negligence in three respects, namely:

'' (1) In installing transformers improperly and insufficiently grounded.

"(2) In installing fuses between its transformers and power lines of such size and strength as to afford inadequate or no protection to plaintiffs' property against excessive voltage.

"(3) In holding closed the breakers at its substation for several minutes after they had kicked out.

"All of these charges of negligence defendant has denied.

"I instruct you that a recovery may be had by plaintiffs, if at all, only on the charges of negligence pleaded. 'No recovery can be had on acts of negligence, or upon negligent conduct not alleged, as a defendant in such an action is entitled to know by the pleadings just what he is called upon to meet.' (*Brown* v. *Northern Cal. Power Co.*, 14 Cal. App. 651, 655 [114 Pac. 54, 74].)

### Instruction No. 13.

"If you find it to be a fact that plaintiffs' property was set on fire by means of electric current on the 29th day of July, 1923, it does not necessarily follow therefrom that your verdict should be in favor of plaintiffs and against defendant. You should not return your verdict against the defendant in this case unless you find by a preponderance of evidence the defendant to have been guilty of some negligence charged in the complaint which contributed directly and proximately to the burning of this property. The defendant is not liable if the plaintiffs' property was set on fire by an electric current without negligence on the part of defendant."

### Instruction No. 14.

"In proving the cause of action set out in the complaint, the burden of proof is on plaintiff to show first, that said buildings were set on fire by means of an electric current; second, that the fire thus caused was the result of one or more of the acts or omission to act on the part of the defendant as set out in plaintiffs' complaint, and, third, that this act or acts or the omission to act by the defendant was negligence on its part."

### Instruction No. 15.

"If all of the evidence, fairly considered, leaves this matter in doubt, so that you are left to guess or conjecture as to whether the fire was caused by an act of negligence on

the part of the defendant as set out in the complaint or in some other way, there can be no recovery by the plaintiffs and your verdict on the complaint of plaintiff and the answer of defendant must be for the defendant.'' (*Clifford* v. *M. St. P. & S. S. M. R. Co.*, 105 Wis. 619 [81 N. W. 143].)

### Instruction No. 16.

"I instruct you that you will have no right to find a verdict against defendant and in favor of plaintiffs solely because the defendant was furnishing electricity to plaintiffs to be used by plaintiffs in their compressor house, even though you find as a fact that the fire that destroyed said buildings was caused by electricity. Defendant in supplying electricity to plaintiffs' buildings did not guarantee that said buildings would not be set on fire from the electricity.''

In view of the rule that instructions must be considered as a whole and that the error in the instruction is cured if, when the whole charge is taken together, the law is accurately stated, we are of the opinion that the jury in this case was not misled by the giving of the instruction complained of. By reason of the fact that the jury was instructed over and over again that the specific negligence alleged must be proved by a preponderance of the evidence before the plaintiff was entitled to recover, the general language in the instruction alleged to be erroneous was limited and applied to instructions pertaining to the installation and maintenance of the particular portion or part of the equipment alleged in the complaint, as constituting the gravamen of the charge of negligence. It does not appear from the record that general negligence on the part of the defendant was urged before the jury either in the introduction of testimony or in the argument of counsel, and, therefore, the instructions which we have quoted, and especially number 15, limits the general instruction alleged to be error to the specific acts alleged in the complaint, from which we conclude that no prejudice resulted to the defendant, even though measured by the rule announced in *Marovich* v. *Central Cal. Traction Co.*, *supra*, the instruction should not have been given. Error is also alleged in relation to a few of the other instructions given by the trial

court which we think untenable and not of sufficient importance to require a further discussion in this opinion.

The judgment of the trial court is affirmed.

Thompson, J., *pro tem.*, and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 18, 1927.