[Civ. No. 1562.   Third Appellate District.—November 17, 1916.]

# M. G. SILVA, Respondent, v. NORTHERN CALIFORNIA POWER COMPANY (a Corporation), Appellant.

NONSUIT—INTRODUCTION OF EVIDENCE AFTER DENIAL OF MOTION—RULE. Where evidence on the part of both plaintiff and defendant is admitted after a motion for a nonsuit is denied, the order will not be disturbed if all the evidence given by both parties supports the verdict.

NEGLIGENCE—FIRE BY DEFECTIVE ELECTRIC WIRE—LIABILITY OF COMPANY SUPPLYING ELECTRICITY.—In an action for damages resulting from the destruction of a tankhouse by fire through the alleged negligence of a company delivering the electricity to the house, where the evidence shows that the fire started at a point on the wire admittedly owned by and in the control of the defendant, outside the house, and that the wires in the house owned by the plaintiff were in good condition, a *prima facie* case of negligence on the part of the defendant sufficient to cast the burden of proof upon it is shown.

ID.—DOCTRINE OF RES IPSA LOQUITUR.—When a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence in the absence of explanation by the defendant that the accident arose from want of care.

ID.—EVIDENCE—FABRICATION OR SUPPRESSION OF EVIDENCE—ADMISSIBILITY OF.—All efforts by either party to a suit, directly or indirectly, to destroy, fabricate, or suppress evidence, may be shown not as a part of the *res gestae* but in the nature of an admission that the party has no sufficient case unless aided by suppressing evidence, or by the fabrication of more evidence.

ID. — INSTRUCTIONS — PROPER REFUSAL. — In such an action the court properly refused to instruct the jury, "You are instructed that under the issues presented in this case the defendant cannot be held liable in any way for any defective wiring in said tankhouse, if any existed," where there was no evidence tending to show that the wiring in the tankhouse was defective, but the evidence showed that this wiring was done by defendant, and that it served its purpose perfectly, and was in as good condition when the fire occurred as when put in place; especially where the court instructed the jury at defendant's request that it was not an insurer, and that if it used ordinary care it could not be held liable.

APPEAL from a judgment of the Superior Court of Butte County. H. D. Gregory, Judge.

The facts are stated in the opinion of the court.

Frank Freeman, for Appellant.

J. R. Robinson, for Respondent.

CHIPMAN, P. J.—The action is for damages occasioned by the alleged negligence of defendant in delivering electricity to plaintiff's tankhouse, resulting in the destruction of the latter by fire. The cause was tried by a jury and plaintiff had the verdict for five hundred dollars. Judgment was accordingly entered from which defendant appeals on bill of exceptions.

The negligence complained of consisted in want of proper care in the delivery of electricity to plaintiff's motor placed in said tankhouse. Paragraphs III and IV of the amended complaint set forth the following facts:

"That at a time prior to the destruction of said tankhouse by fire as hereinafter stated, and at the request of plaintiff, and for the purpose of supplying and selling to plaintiff electricity to propel said motor, defendant erected, placed, and installed the necessary wiring, appliances and apparatus for the purpose of conveying an electric current from its said power line to said motor in said tankhouse. That said wiring, appliances, and apparatus as so installed extended from one of the poles of said power line on said land near said tankhouse to the said motor in said tankhouse, and included a transformer placed by defendant on said pole and connected with said wires for the purpose of reducing the current of electricity that should be conveyed to said tankhouse, and that from said transformer, the said wires as so installed extended to said tankhouse, where they entered the same through holes in the wall thereof made by defendant for said purpose and at an elevation of about eighteen feet from the ground, and that they ran thence along and down the inner wall of said tankhouse to an electric meter, which was at all times herein mentioned owned by, and under the supervision and control of, defendant and used by it to measure the electricity used by plaintiff for his said purposes, and which meter was situated on the inner wall of said tankhouse near said motor.

That from said meter said wires ran to a switch board on said inner wall near said motor, and were thence connected with said motor. That all said appliances, wires and apparatus were installed by defendant as above stated. That thereafter and until the fire hereinafter referred to, plaintiff purchased of defendant and defendant sold to plaintiff electricity for his said purposes and which was delivered and conducted over and through said wiring and appliances as so installed.

"And plaintiff alleges that the wires, appliances and apparatus herein referred to connected with and extending from said power line to the place where said wires entered said tankhouse as above stated, and used by defendant to supply plaintiff with electricity as above stated, were at all times herein mentioned owned by, and under the supervision and control of, defendant, and that prior to and at the time of the fire hereinafter referred to, defendant negligently and carelessly allowed the same to be and remain, and by reason of said negligence they became, and were, in such condition as to admit a dangerous amount of voltage of electricity to said wires in said tankhouse and thereby to render them dangerous and unsafe with respect to causing fire to said tankhouse.

"And plaintiff alleges that by reason of said negligence and carelessness, and or or about the 15th day of January, 1915, the electric current conveyed by said wires at said tankhouse caused the said structure to ignite and take fire at or about the place where said wires entered said structure, and that the said tankhouse, together with its contents, including said pump and motor, were burned and entirely destroyed by said fire."

A general and special demurrer was overruled and defendant answered; admitted wiring plaintiff's tankhouse as alleged, but denied that defendant had any control over the same; alleged that it did have control over the wires leading from the transformer to a point within a few inches of the tankhouse, but denied that it had any control or was under any duty to keep in repair any wires beyond said point or in said tankhouse; admitted ownership of the meters in the tankhouse, but alleged that these were properly installed and were safe; denied that the wires which defendant did control were dangerous or unsafe in any respect and denied any responsibility for the fire.

At the close of plaintiff's evidence a motion for nonsuit was made and denied. The correctness of the ruling is not made the subject of discussion for the reason that evidence on the part of both plaintiff and defendant was admitted after the motion was denied. The rule is that if all the evidence given by both parties supports the verdict, the order denying the motion for nonsuit will not be disturbed. (*Van Horn* v. *Pacific Refining etc. Co.*, 27 Cal. App. 105, 111, [148 Pac. 951].)

Plaintiff lived upon a farm a short distance from the city of Chico, Butte County; his residence was about forty-five feet from the tankhouse. Defendant, about two and a half years before the fire, had built a power line over plaintiff's land carrying six thousand six hundred volts of electricity; one of the poles of this line was 169 feet from the tankhouse, and on this pole was installed a transformer designed to reduce the current passing into the tankhouse to 220 volts, admittedly the proper quantity for the purpose of operating plaintiff's motor; the wires from the transformer to the tankhouse entered the latter through the shingled wall at a height of 22 feet from the ground and just below the floor on which the tank rested; these wires crossed the tankhouse under this floor to the opposite wall and ran down that wall to meters and thence to the motor; between the meters and motor was a switch for controlling the current passing into the motor and there was also a switch above the meter; all the wires and appliances for operating the motor were installed by defendant; the meters were owned by defendant and were used to measure the electricity sold by defendant to plaintiff; the wires from the transformer to the house were owned by defendant but the wires inside the house were paid for by plaintiff; he testified that he didn't know they belonged to him until he heard it so stated after the fire occurred; whether his or defendant's is perhaps not important, for they were used by defendant to supply the current and there was no evidence that there was anything wrong with the inside wires. About a year before the fire the transformer burned out and the fire consumed the pole; the pole and transformer and the wires to the tankhouse were replaced at that time; the day before the fire something went wrong with the motor and plaintiff telephoned to defendant; an electrician was sent out by defendant on the day of the fire. Plaintiff testified: "He

came out and tested the fuse, put on some more fuses, throwed the switch, the fuse blowed right out and he put on some more fuses and then he said the motor was burned out, he told me I would have to bring it in and he left for town. . . . When he went away he left the fuses he had put back. He put in the first fuses and they blowed out, then he put in some more fuses and he left." It appeared that no other change took place inside the tankhouse that day, and at 9:30 that night the tankhouse fire occurred.

Referring to the wires in the building, plaintiff testified: "Those wires were in the same condition they were at the time they were put in—at the time they were put in by the defendant. They have never been changed nor moved. The building has never been repaired, nor has any part of it." Of the wires going from the transformer to the building, he testified: "As those wires come from the pole to the building, they go right straight from the pole to the building. They are fastened on the outside of the building, right there on the side. I think they are fastened above the holes that they go through. They are fastened to some hooks. The wires that come from the pole go directly to those hooks and are fastened to the hooks. Then the wires that go through the building are connected onto those wires and they sag down a little and go into the building. It is a different wire that goes into the building from the wire that extends from the pole to the tankhouse. The wire that goes through the hole in the building is fastened to those wires that extend from the pole."

The witnesses to the fire all agree that it started outside of the building, and at the point on the outside and next to the building where the defendant's wires were connected with the wires running into the building. Plaintiff testified that his attention and that of his wife was called to the fire by his daughter when the fire started, and the blaze was right at the junction of these wires next to the tankhouse; that he ran to the tankhouse and went in and took out one or two articles; that while in the building he looked up to where the wires entered and there was no fire inside.

Mrs. Silva's testimony, as well as that of neighbors attracted to the fire, was corroborative of plaintiff's testimony. It appeared that in the installation of the plant by defendant the wires running from the transformer to the building were

hung on a hook screwed into the building and connected with the inside wires two or three inches from the building. At this point insulators and what were called circuit-breakers were on defendant's wires. Witness Wright arrived at the tankhouse shortly after the fire started. He testified: "The fire was burning around the wires at the place where the wires went into the tankhouse. . . . Q. Could you state whether or not all of. the insulation was burned off at the end of those wires for two or three feet back from the end of the wires? A'. I think it was all burned off before they fell."

The office intended to be performed by these circuit-breakers and insulators on defendant's wires at the point of connection with the wires going inside, was to control the current or prevent its doing damage in passing into the building.

It further appeared that after the wires fell to the ground the ends were brought together and caused a spark showing that the current was then passing from the transformer over these wires. It appeared that the wires were insulated where they passed through the walls of the building and were at the time in place, and, so far as known, in good condition. And the evidence was that the fire did not start elsewhere than on the outside and at the point of connection as already explained. The evidence was that the fire could not have been caused by any agency other than the electricity passing from the transformer. And as the fire started at a point on the wires admittedly owned by and in the control of defendant, we think sufficient was shown to make a *prima facie* case of negligence on the part of defendant and to cast upon defendant the burden of excusing its negligence.

We had occasion to examine somewhat fully into the doctrine of *res ipsa loquitur* in the case of *Hill* v. *Pacific Gas & Electric Co.*, 22 Cal. App. 788, [136 Pac. 492], and we there held the rule inapplicable to the electric company for the reason that as to that company the evidence did not measure up to the requirements of the rule which is as stated in *Judson* v. *Giant Powder Co.*, 107 Cal. 549, 556, [48 Am. St. Rep. 146, 29 L. R. A. 718, 40 Pac. 1020]; "When a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence in the

absence of explanation by the defendant that the accident arose from want of care.''

Defendant's position is a denial that the rule *res ipsa loquitur* has any application to the case, and that it was ''essential for plaintiff to show from the record by his complaint and sustaining evidence, that defendant was under an obligation with plaintiff to maintain the wires and apparatus under its contract in such condition as not to deliver to plaintiff a dangerous amount of voltage of electricity, and that it did deliver such dangerous amount of voltage to plaintiff's intended and known purposes; and that the damage complained of resulted from such delivery.''

We cannot accede to this view of plaintiff's duty. Having shown that the fire occurred under the circumstances and from causes hereinabove pointed out, a *prima facie* case of negligence was made out and shifted the burden upon defendant of showing that defendant was not negligent.

Defendant in fact undertook to show that it was not negligent. It introduced two witnesses, defendant's linemen, who testified that they were at the tankhouse the morning after the fire and tested the transformers and found them in good condition; that they took the three service wires from the pole lying upon the ground and carried them to defendant's office and locked them up where they remained in their then condition until produced at the trial and were introduced as exhibits; that ''each of the three wires put in evidence as defendant's exhibits, has on the end, alleged by defendant's witnesses to have been attached to the tankhouse, a loop, which is claimed by defendant to have been attached to an iron screw hook five inches long, and screwed into the wall of the tankhouse. On each wire from this loop . . . is a porcelain knob or ball called a 'circuit-breaker' or 'insulator,' '' the purpose of which was to keep the voltage away from the building; that these knobs were still on the end of the wires, and that no insulators had burned off except on that part of the wires that entered the building carrying the current. This evidence was put forward to establish the theory that the fire started in the wall of the building from the wires over which defendant had no control. The presence of the unburned knobs at the end of the wires leading from the transformers showed, it is urged, that the fire was not

caused by defective appliances belonging to defendant. These same witnesses also testified to testing the transformers and finding them in safe condition. Witnesses for plaintiff, who were at the fire, were very positive in their testimony that the appliances used to safeguard the electricity passing into the building at the point of junction of the wires were all burned off the wires coming from the transformers, and that when the wires fell there were no knobs or anything else on them, but that the wires back for some distance and the insulators on them were burnt off before the wires fell. These witnesses were shown the exhibited wires and testified that they were not the wires that fell from the building, one witness testifying that if they were they had been repaired. Plaintiff testified: ''When the wires fell, there was simply a straight wire, there was no knob on the end of the wire. They burned through and broke beyond the circuit-breaker. In the part where the current was passing through to the building. I am sure that when those wires fell at my place and when Osborne picked them up there was no circuit-breaker attached to the ends of the wires. The fire was burning fully twenty minutes around these wires before they came down, that was the center of the blaze when it started. The end of these wires—the end of that circuit-breaker was right in the fire.''

There was testimony which, if believed by the jury, justified them in finding that the fire occurred as claimed by plaintiff, and it also had a tendency to discredit the testimony of defendant's witnesses upon a very important fact advanced by defendant in explanation of the accident, and would also justify the jury in looking with disfavor upon other testimony of these witnesses.

''It is laid down as a well-settled rule that all efforts by either party to a suit directly or indirectly, to destroy, fabricate or suppress evidence may be shown not as a part of the *res gestae,* but in the nature of an admission that the party has no sufficient case unless aided by suppressing evidence, or by the fabrication of more evidence.'' (1 Jones on Evidence, sec. 22a.) The fabrication of evidence is calculated to raise a presumption against the party who has recourse to such practice, not less than when evidence has been suppressed or withheld. It was for the jury to determine in what light defendant's testimony was to be considered.

There was testimony submitted by defendant tending to show that the burned-out condition of the motor might have caused a short circuit, the effect of which would be the blowing out of the fuse in the tankhouse. It is suggested as defendant's theory that "the fire may have started because the insulators were affected by the burned-out motor and the resultant short circuit." This is mere conjecture. There was no evidence that such effect would follow. In reply it may be said that the appliances used by defendant to control the current are intended to withstand the burning out of a motor, which latter is not an uncommon occurrence as the evidence showed. There was testimony submitted by plaintiff that failure to keep the necessary quantity of oil in the transformer would sometimes cause it to burn out, or cause a short circuit which, for the time, would increase the voltage on the wires running from the transformer.

Defendant failed to acquit itself of negligence by evidence overcoming the *prima facie* case made by plaintiff. The defense seems to rest primarily upon plaintiff's failure to show facts sufficient to call for any explanation by defendant. This, we think, is based upon a misconception of the rule applicable to the case as developed by the evidence.

The court gave a number of instructions at the request of the defendant and on its own motion. At the close of defendant's instructions the court refused the following: "You are instructed that under the issues presented in this case the defendant cannot be held liable in any way for any defective wiring in said tankhouse, if any existed." There was no evidence tending to show that the wiring within the tankhouse was defective. The evidence was that this wiring was done by defendant, that it served its purpose perfectly, and was in as good condition when the fire occurred as when put in place. The burning out of the motor was from some inherent defect and in nowise related to the wiring, and it was not claimed that defective wiring within the building caused the fire. The evidence as to the cause of the fire centered around the insulators or circuit-breakers in defendant's control where the fire first occurred. We cannot see that the instruction, given in its concrete form, would have been of any service to defendant. Besides, instruction 9, given at defendant's request, seems to have been sufficient upon this point, for in all probability it was an excessive voltage passing from the trans-

former, for the moment, and not defective wiring that caused the accident. Instruction 9 was as follows:

"I instruct you that while the law required of the defendant that it should use ordinary care to see that an unnecessarily dangerous amount of electricity, with respect to causing fires, was not permitted to enter upon the wires in said building of plaintiff, yet this does not make of the defendant an insurer. It only required of the defendant that it should exercise ordinary care; that is, such a degree of care as an ordinarily prudent man under like circumstances would exercise, and if you find from the evidence that the defendant did exercise such ordinary and reasonable care to see that a dangerous and unnecessary amount of electricity, with respect to causing fires, did not enter upon the said wires in the said tankhouse, then, notwithstanding the fact that a fire did result from such electricity, if you should so find, then it will be your duty to find a verdict for defendant."

Defendant was further safeguarded by instruction 7, given at its request, as follows:

"If you find that the said fire that destroyed said tankhouse was actually caused by reason of the wires, appliances and apparatus of defendant being in such condition as to allow a dangerous and unsafe amount of voltage of electricity into the wires in said tankhouse, still the defendant is not liable in damages to plaintiff, and you cannot find a verdict against defendant, unless you also find that the defendant failed to use due and ordinary care to prevent such condition."

It is claimed that instruction No. 21 "is confusing, inaccurate and prejudicial, because it makes no distinction at all between the defendant's service wires and the plaintiff's wires, and predicates defendant's liability upon both wires, whereas, the complaint predicates defendant's liability upon only its negligence and carelessness in allowing 'the wires, appliances and apparatus herein referred to connected with and extending from said power line to the place where said wires entered said tankhouse as above stated and used by defendant to supply plaintiff with electricity as above stated' (quoted from the complaint), to be and remain in such condition as to admit a dangerous amount of voltage to said wires in said tankhouse, and to thereby render them (the wires in the tankhouse) unsafe with respect to causing fire to said tankhouse."

The point of the objection arises out of a reference in the instruction to the wires within the building, whereas it is claimed that the complaint is founded, and other instructions also, on the theory that the alleged negligence consisted in defendant's failure to exercise care to keep the wires and apparatus which were under its control in a safe condition. Instruction No. 20 was as follows:

"If the jury believe from the evidence that at the time and place claimed by plaintiff and mentioned in the proof, the wires, appliances and apparatus referred to in this action extended from defendant's power line to the place where said wires entered the tankhouse of plaintiff, and that said wires were used by defendant to supply plaintiff with electricity, and that at said time and place mentioned in the proof were under the supervision and control of defendant, then it was the duty of the defendant, through and by its employees in charge of and in control of said wires, appliances and apparatus, to use and exercise ordinary care to operate and control same and to reasonably control and regulate a reasonably safe amount of electricity to pass through said wires, apparatus and appliances, and to do so in a reasonably safe manner for the reasonable protection of plaintiff's building and property from fire."

In instruction No. 21 the jury were told that if they find that plaintiff exercised reasonable care in operating his motor and pump, and if they find that at said time "the wires, appliances and apparatus mentioned in the proof extended from said power line and entered the said tankhouse and were at said time and place under the supervision and control of defendant and that defendant failed to exercise ordinary care to keep said wires, appliances and apparatus in reasonably safe condition and failed to reasonably regulate the amount of electricity passing through said wires into plaintiff's said pump house," etc.

Defendant could not have been prejudiced by this instruction for the reason that there was no evidence that the wires within the building were defective, or that the fire was caused by any condition existing in the building through defendant's or plaintiff's negligence. The instructions given by the court very clearly left with the jury the question whether or not the fire occurred at a point where defendant had control of the wires and appliances, and whether or not defendant was

guilty of negligence in conveying the electricity by means of these wires and appliances to the tankhouse. Instruction 7, above quoted, and instruction 11, given at defendant's request, show that this was the dominant question submitted to the jury and properly so. Instruction 11 was as follows:

"If defendant used ordinary care and was not guilty of carelessness or negligence, and did not carelessly or negligently allow the wires, appliances or apparatus, as the same are described in the amended complaint, to become in such condition as to admit a dangerous amount or voltage of electricity to said wires in said tankhouse and thereby to render them unsafe or dangerous with respect to causing fire to said tankhouse, you cannot find for plaintiff and against defendant."

We do not think the instructions were either confusing or prejudicial, but that the issues arising out of the evidence as well as the pleadings were submitted upon instructions which fairly gave the law to the jury.

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 15, 1917.