ILLINOIS POWER & LIGHT CORPORA-
TION v. HURLEY et al.

No. 9006.

Circuit Court of Appeals, Eighth Circuit.
April 16, 1931.

Rehearing Denied May 26, 1931.

Thomas F. Doran, of Topeka, Kan., and E. Bentley Hamilton, of Peoria, Ill. (T. M. Pierce and Anderson, Gilbert & Wolfort, all of St. Louis, Mo., on the brief), for appellant.

John S. Leahy, of St. Louis, Mo. (T. J. Hoolan and Leahy, Saunders & Walther, all of St. Louis, Mo., on the brief), for appellees.

Before STONE and GARDNER, Circuit Judges, and WOODROUGH, District Judge.

GARDNER, Circuit Judge.

This is an action brought by appellees as trustees for Cain-Hurley Lumber Company, a Missouri corporation, dissolved, to recover damages on account of fire loss sustained by that company, and which it is claimed was

caused by the negligence of the Madison County Light & Power Company, appellant's predecessor. The Madison County Light & Power Company was an Illinois corporation, which, subsequent to the fire and prior to the commencement of this action, became consolidated with or was absorbed by the Illinois Power & Light Corporation, appellant herein. It is conceded that the Illinois Power & Light Corporation, when it succeeded to the assets of the Madison County Light & Power Company, also assumed all the liabilities of that company.

For convenience, appellant will be referred to as defendant, and the appellees will be referred to as plaintiffs, except where it may be necessary to refer to the corporations.

At the time of the fire, the power company was supplying the lumber company with electricity for the operation of its plant, and it was claimed by the lumber company that the fire which destroyed its property resulted from the negligence of the power company in maintaining and operating its electrical installations. The light and power which was furnished the lumber company by the power company was supplied through three transformers, located near the northwest corner of the lumber yard. These transformers were located and maintained within eighteen to twenty-four inches of one of the buildings belonging to the lumber company. They rested on a platform which was fastened eight feet above the ground to two poles which extended beyond the top of the transformers to a height of twenty-eight feet from the ground. The roof of the building was a gable roof, extending from the building, and the eaves extended down to just above the transformers and at about the same height. The electric current was transmitted from the power house through primary wires attached to the top of the poles, then down through three fuse cut-outs into these transformers, whence the electricity was led into the planing mill through wires to a meter board, which was situated inside the building, and through the meter board distributed throughout the plant wherever needed. These transformers were approximately four and one-half feet high and two and one-half feet wide, and were placed on the platform above described. About two and one-half feet above the transformers were three fuse cut-outs, serving the purpose of protecting the transformers against an overload of current. The electric current, by means of the transformers, was reduced from 2,300 volts to 220 volts, and delivered to the plant at this reduced voltage through secondary wires. The power company erected, owned, and maintained the transformer installation, the secondary wires, and the meter board, and had exclusive charge and control of them, and all electricity used at the plant came over and through this equipment, including the wires and transformers, while the wiring from the meter board throughout the plant was owned and controlled by the lumber company.

The jury returned a verdict in favor of the lumber company for $100,000, and from the judgment entered thereon the power company has appealed to this court. On a former appeal to this court, from a judgment in favor of the lumber company for $120,000, the case was reversed for the insufficiency of the evidence to sustain the verdict. Illinois Power & Light Corporation v. Hurley et al. (C. C. A.) 30 F.(2d) 905. On this appeal it is urged that the court erred: (1) In overruling the defendant's motion to dismiss the action, unless the plaintiffs should show that they had available additional noncumulative evidence, pertinent and substantial and newly discovered, and unobtainable at the time of the prior trial; (2) in overruling defendant's motion to direct a verdict in its favor upon plaintiffs' opening statement; (3) in overruling its demurrer to plaintiffs' petition; (4) in permitting plaintiffs to introduce evidence of damages before introducing testimony as to the origin of the fire; (5) in denying defendant's motion for a directed verdict on the ground of (a) insufficiency of the evidence, (b) that the plaintiffs did not have capacity to maintain the action, and (c) because the lumber company had assigned to the insurance companies any claim it might have had on account of the fire loss; (6) in its instructions to the jury.

On the prior appeal this court reversed the judgment and remanded the case for further proceedings in harmony with the opinion. The action being one at law, the reversal of the judgment entitled the parties to a new trial of the action without restriction or limitation. The defendant, however, interposed a motion to dismiss, unless plaintiffs should show that they had available additional noncumulative evidence, pertinent and substantial and newly discovered, and unobtainable at the time of the prior trial. This motion seems to have been interposed on the theory that the cause had been remanded for the purpose of permitting the plaintiffs to make an application for a retrial of the action on the ground of newly discovered ev-

idence. Counsel cite no authority for such a procedure, and we conclude that there is none. Such a procedure would seem to be in direct violation of the Seventh Amendment to the Constitution of the United States. Slocum v. New York Life Insurance Co., 228 U. S. 364, 33 S. Ct. 523, 57 L. Ed. 879; Myers v. Pittsburgh Coal Co., 233 U. S. 184, 34 S. Ct. 559, 58 L. Ed. 906; Fidelity Title & Trust Co. v. Dubois Electric Co., 253 U. S. 212, 40 S. Ct. 514, 64 L. Ed. 865. This court, in reversing the prior judgment, did not purport to place any such conditions or restrictions upon plaintiffs, and the trial court had no authority to require plaintiffs, in a preliminary hearing before the court without a jury, to prove that they had a case for the jury. The motion was not only unique, but, we think, was properly treated by the lower court as frivolous.

■■ Defendant moved for a directed verdict, based upon the opening statement of counsel for plaintiffs, and it urges here that the court erred in denying its motion. It is doubtless within the power of the trial court to direct a verdict on the opening statement of counsel, but this should not be done unless it clearly appears from the plaintiff's opening statement that he cannot recover. The rule is only applicable where the statement clearly shows that no cause of action exists. To warrant the court in granting such a motion, it is not enough that the statement of counsel be defective, but it must affirmatively appear therefrom that no cause of action in fact exists. The rule clearly has no application in the instant case, and the court properly overruled the motion.

■■ Contending that the court erred in overruling the demurrer to the petition, it is pointed out that the lumber company was a Missouri corporation carrying on business in Illinois and that the cause of action arose in Illinois; that the corporation on the 6th of November, 1922, withdrew from Illinois, and was dissolved in accordance with the laws of the state of Missouri, the state of its creation and domicile, on the 1st of December, 1922, and it is urged that the cause of action died with the dissolution of the company, and that the right of the company or its representatives to maintain an action thereon must be determined by the statute of the state where the cause of action arose. In support of this premise a number of authorities are cited, but investigation shows that all of them refer to a liability created by a statute. In the instant case the cause of action was not created by, nor dependent upon, any statute of the state of Illinois, but it was a common-law action for tort. The premise, on which appellant's argument is predicated, is therefore false, in that it assumes that the liability sought to be enforced was created by the Illinois statute. Confessedly, where a liability is based upon a cause of action created by statute, it carries with it all the limitations, burdens and conditions of the statute creating it. Where, however, the cause of action is one bottomed on the common law and is transitory in character, we need not look to the law of the state where the action arose for the purpose of determining the remedies applicable. The Illinois statute of limitations could, therefore, not be invoked. M'Cluny v. Silliman, 3 Pet. 270, 7 L. Ed. 676; Gregory v. Southern Pacific Co. (C. C.) 157 F. 113; Munos v. Southern Pacific Co. (C. C. A.) 51 F. 188, 190. In Munos v. Southern Pacific Co., supra, the rule is stated as follows: "'Where torts are committed in foreign countries, or beyond the territorial jurisdiction of the sovereignty in which the action is brought, the lex fori governs, no matter whether the right of action depends upon the common law or a local statute, unless the statute which creates or confers the right limits the duration of such right to a prescribed time.'"

■ It is to be observed that the lumber company withdrew from Illinois November 6, 1922, before the time of its dissolution. It was vested with this right of action, and at the time of its dissolution, no statutes of Illinois could be invoked as affecting this common law liability. Counsel cite the Illinois statute with reference to the dissolution of corporations, but manifestly this statute could not control in the matter of the dissolution of a Missouri corporation. Dundee Mortgage & Trust Investment Co. v. Hughes (C. C.) 89 F. 182; Harris-Woodbury Lumber Co. v. Coffin (C. C.) 179 F. 257, affirmed (C. C. A.) 187 F. 1005; Scott v. Stockholders' Oil Co. (C. C.) 142 F. 287; L. Bucki & Son Lumber Co. v. Atlantic Lumber Co. (C. C. A.) 128 F. 332. We must therefore look to the statutes of Missouri to determine the legal capacity of the plaintiffs to maintain this action.

■■ Section 9755 of the Revised Statutes of Missouri 1919 provides as follows: "Upon the dissolution of any corporation already created, or which may hereafter be created by the laws of this state, the president and directors or managers of the affairs of said corporation at the time of its dissolution, by whatever name they may be known in law,

shall be trustees of such corporation, with full powers to settle the affairs, collect the outstanding debts and divide the moneys and other property among the stockholders, after paying the debts due and owing by such corporation at the time of its dissolution, as far as such money and property will enable them; to sue for and recover such debts and property by the name of the trustees of such corporation, describing it by its corporate name, and may be sued by the same; and such trustees shall be jointly and severally responsible to the creditors and stockholders of such corporation to the extent of its property and effects that shall have come into their hands."

The language of the statute is very broad. By its provisions, the trustees are endowed with all the functions necessary to protect the interests of the dissolved corporation, and to continue such corporation for all purposes, except the transaction of new business. There is nothing to indicate that it was the intention of the Legislature to deprive a dissolved corporation of the right to recover on any cause of action, whether based upon contract or sounding in tort, which was vested in it at the time of its dissolution. The trustees have the duty of settling the affairs of the corporation, or collecting the debts due it, and have power "to sue for and recover such debts and property." Having in mind the purpose of the statute, it would seem clear that, even though strictly speaking a debt may not include a tort, a chose in action, whether based upon contract or sounding in tort, is personal property, and that was one of the matters remaining at the time of the dissolution of the corporation to be wound up, and these trustees were in fact the corporation itself for all the purposes of winding up its affairs. Berson v. Ewing, 84 Cal. 89, 23 P. 1112; Melvin v. State, 121 Cal. 16, 53 P. 416; Arkansas Life Ins. Co. v. American National Life Ins. Co., 110 Ark. 130, 161 S. W. 136; Imperial Film Exch. v. General Film Co. (D. C.) 244 F. 985.

Other questions raised on the demurrer to the petition have been considered, but in our view are entirely without merit. We put to one side, as unworthy of serious consideration, the contention that the lower court erred in overruling defendant's motion to make the petition more definite and certain. There was clearly no abuse of discretion in denying the motion, and no prejudice resulted therefrom.

█ The contention that the court erred in permitting plaintiffs to introduce evidence of their damages before introducing testimony as to the origin of the fire is answered by the suggestion that the order of proof rests within the sound discretion of the trial court. No prejudice having resulted to the defendant by reason of the ruling of the court, it cannot be said that the court's discretion was abused.

█ It is urged that the court erred in overruling the objections of the defendant to certain expert testimony. The objections were, so far as specified, on the ground that the questions did not embrace all the facts and that they called for answers which would invade the province of the jury. Counsel declined to suggest any part of the evidence that was claimed to be improperly omitted from the questions, and an examination of the record indicates that the objections on this ground were too general to present anything for review; neither is there any merit in the contention that the questions called for conclusions of the witness and invaded the province of the jury. The witness was qualified as an expert, and the matters upon which he was interrogated were properly subjects of expert testimony. The fact that the questions may have involved some ultimate fact to be determined by the jury did not render them objectionable. United States Smelting Co. v. Parry (C. C. A.) 166 F. 407; Central Coal & Coke Co. v. Williams (C. C. A.) 173 F. 337; Denver & R. G. R. Co. v. Roller (C. C. A.) 100 F. 738, 49 L. R. A. 77; Chicago, B. & Q. R. Co. v. Conway (C. C. A.) 29 F.(2d) 551; Runkle v. United States (C. C. A.) 42 F.(2d) 804; Cropper v. Titanium Pigment Co. (C. C. A.) 47 F. (2d) 1038; O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55.

█ It is also urged that the court erred in admitting evidence in rebuttal that was not properly rebuttal testimony. We need not consider whether or not, technically considered, the testimony objected to was proper rebuttal, because it is so well established by the authorities that the order of introducing testimony rests within the sound discretion of the trial court, and the ruling of the court below was not an abuse of discretion. Defendant offered in evidence a report filed with the state fire marshal of Illinois, and its rejection by the court is urged as error. The report was made by the volunteer fire chief of the city of Brooklyn, Ill., and contained his opinion as to the cause of the fire. This was not binding on the plaintiffs and was clearly hearsay. The witness who made the report was present at the trial and could have

testified to all the facts embodied in the report, and he would then have been subject to cross-examination. The theory upon which it was offered was that it was in the nature of an admission by the witness Royals, who was superintendent of the lumber company at the time, and who was a witness on behalf of the plaintiffs. The only foundation for the admission of the statement was the testimony of the witness that he made his investigation as to the cause of the fire with Royals, and that Royals knew about the report. This did not constitute any admission by Royals, nor was there anything to prove that Royals supplied the information forming the basis of the report, or that he approved the report as made. The document was clearly hearsay and inadmissible.

 The overruling of defendant's motion for a directed verdict presents the question of the sufficiency of the evidence. It is not, however, our province to weigh the evidence, but to determine only whether or not there was substantial evidence to sustain the verdict. Atchison, T. & S. F. Ry. Co. v. Condos (C. C. A.) 30 F.(2d) 669; Flannery v. Willcuts (C. C. A.) 25 F.(2d) 951; Concordia Fire Ins. Co. v. Commercial Bank (C. C. A.) 39 F.(2d) 826; Hardy-Burlingham Mining Co. v. Baker (C. C. A.) 10 F.(2d) 277; Security Life Ins. Co. v. Brimmer (C. C. A.) 36 F.(2d) 176; Southern Ry. Co. v. Walters (C. C. A.) 47 F.(2d) 3; Michigan Central R. Co. v. Mix, 278 U. S. 492, 49 S. Ct. 207, 73 L. Ed. 470; Slocum v. New York Life Ins. Co., 228 U. S. 364, 33 S. Ct. 523, 57 L. Ed. 879. In considering this ruling, the testimony in favor of the plaintiffs must be accepted as true, and plaintiffs were entitled also to such reasonable favorable inferences as might be fairly drawn therefrom. Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720; Wharton v. Aetna Ins. Co. (C. C. A.) 48 F.(2d) 37. Where the evidence, when so considered, is of such a character that reasonable men may reach different conclusions, then the case is one for the jury. Mutual Life Ins. Co. v. Hatten (C. C. A.) 17 F.(2d) 889; Crookston Lumber Co. v. Boutin (C. C. A.) 149 F. 680; United States Can Co. v. Ryan (C. C. A.) 39 F.(2d) 445.

The evidence of the plaintiffs was in conflict with that for the defendant on the controlling issues. We shall consider the case as the jury might have found it to be, accepting the plaintiffs' evidence to be true, as the verdict shows they did.

At about 1:30 a. m. on February 23, 1922, Carl Avra, night watchman for the lumber company, while making his rounds through the plant, observed a flash of light in the direction of the transformers. Approaching them, he discovered a large flame at the bolt which fastened the transformer platform to the pole on the north end of the structure. This flame was six inches long, two or three inches in diameter, and an inch or so in depth into the pole, was blue in color, and extended out and up and down the pole. Below the bolt, the fire was working its way back and forth into the checks of the pole and had charred the wood around the bolt and burned a hole through the brace about two inches in diameter. He immediately secured a fire extinguisher and played its contents on the fire, but without effect. He then telephoned to the fire department, as he thought the mill was threatened by fire. The fireman advised him that he needed an electrician, and the fireman volunteered to notify the electricians. Avra then telephoned Royals, the superintendent of the lumber company, who, within twenty-five or thirty minutes, arrived at the plant. Royals testified that when he arrived there was a blue colored flame around the bolt connecting the transformer platform to the pole on the north end of the transformer bank, describing it substantially the same as did Avra. It was then decided to remove the fuse cut-out over the north transformer, and for that purpose the night watchman Avra sent for one Harry Dreams, who lived at the lunch room located within the yard. Dreams came over, put on a pair of rubber gloves, climbed a ladder, and pulled the fuse at Royals' direction, and upon the fuse being removed, the fire disappeared.

Dreams testified that when he arrived at the transformers there was a blue flame playing up and down the pole at the north end of the transformers and around the bolt that secured the transformer platform to the pole.

It had been raining intermittently all that night, the rain having started about seven o'clock on the evening of the 22d. After the fuse plug was pulled, Royals telephoned the power company with reference to the trouble, and shortly thereafter Mr. Anderson, the line foreman for the power company, arrived with Mr. McKinnon and Mr. Smithers, line trouble men. Due to darkness, they did not make a careful inspection, but the line men put on rubber boots and rubber gloves, and, under Anderson's direction, climbed up a ladder and cut the primary wire on each side of the fuse cut-out, and put on a by-pass or

jumper. This isolated the fuse cut-out and ran the primary wire through to the transformer without passing the current through the fuse cut-out. The fuse plug was then replaced, which resulted in a little sparkling and glowing of electricity, showing a leak, and which indicated that there was trouble at that point. After putting on this jumper, the power people started a three-phase motor in the plant to test the circuit. Anderson testified that he could not state what the exact physical condition of the transformers was, as he had no way to test them.

Royals left these line men and foreman working at the transformers, and went to the lumber company's office, while Avra, the night watchman, continued on his rounds. Dreams remained at the transformers until the work was done. When the men had finished the work, they, with Dreams, went to the office of the lumber company. While they were in the office, Royals asked Anderson about the condition of the transformers, and Anderson told him that one of the transformers was "shot," that the condition of the weather would not permit him to make a very extensive examination or repair that night, but he would be back early next day and fix it up. Dreams also testified to this statement by Anderson.

After Anderson and his men left, Royals remained in the office, as he could not get the lights to burn on his car. Dreams remained also, and while he was talking to Royals, the electric lights in the office began to flicker and go off and on, and soon they went off completely. The electricity furnishing the lights in the office came from the same transformer bank in question. Dreams and Royals stood in the office, discussing the action of the light, when Dreams' wife ran to the door and shouted that the mill was afire. This was just a little before 6 o'clock in the morning. Royals testified that he immediately ran up toward the transformers and saw the transformer platform and poles all afire. The fire was leading into the roof of the mill, and the gable end of the mill next to the transformers was beginning to catch afire at that time. The platform, poles, and cross arms of the bank of transformers were apparently all on fire, and the fire was playing around the secondary wires leading into the plant, and the insulation was burning. The flame was a bluish-colored flame, and he saw blue flames leading from the transformer platform and cross bars to the gable end of the mill. The blue flame seen around midnight and the flame seen at 6 o'clock in the

morning were the same color, but the flame at 6 o'clock in the morning was of greater intensity, as there was a small proportion of fire at midnight, as compared with that at 6 o'clock in the morning. There was a very strong wind blowing from the direction of the transformers toward the plant.

Dreams testified that when his wife gave the alarm of fire, he ran to the mill, and when he got in sight of the transformers everything between the poles supporting the transformers was on fire; that he saw fire just on the eaves of the mill; that the eaves of the mill were just above the bank of transformers, not as high as the poles, but just about even with the transformers; and the wind was blowing towards the mill.

Avra, the night watchman, testified that he made his last round of the plant starting from the office about 5 o'clock in the morning; that the first key with which he punched his clock was in the office, and that about five minutes later he would pass the bank of transformers and continue on around the plant, so that about fifteen minutes time would elapse from the time he passed the transformers until he reached the office again. He had made this round and was back in office sweeping out, when Mrs. Dreams gave the alarm, at which time Royals and Dreams ran out the door. As soon as Avra got out the door, he saw flames around the transformers at the end of the mill, the flames flaring up three or four feet. A very small portion of the plant was involved in the fire at that time—the end of the filing room or grain door mill. He also testified that a very strong wind was blowing from the northwest toward the plant.

A. C. Barton, an electrical engineer, testified that at the time of the fire, he was general superintendent of the East St. Louis Cotton Oil Company, and resided about a quarter of a mile from the Cain-Hurley plant. On the morning of the fire, about 5:30 or 6 o'clock, he saw the smoke and blaze at the Cain-Hurley plant and immediately drove over in his car. He went up to the north end of the plant, directly across from the transformers. He saw the transformer platform and pole afire and the end of the building also afire, and insulation was falling off the wires leading from the transformers into the plant, and this insulation was afire. He testified that the color of the flame that he saw around the transformers and on the equipment leading into the plant was a blue blaze around the transformer platform and the pole; that this blue blaze was an elec-

trical blaze and an indication of some electrical disturbance.

Allen Hayes testified that he came to work at the Cain-Hurley plant shortly before 6 o'clock the morning of the fire, and saw the transformer poles, and they were on fire, and all the structure between them was on fire, and there was fire on the eaves of the mill.

Frank Hayes testified that he and his brother Allen arrived at the plant together about 10 minutes to 6, and his testimony was substantially the same as that of his brother.

Joseph A. Osborne, a consulting electrical engineer, who, for twenty years, had been chief electrical engineer for the American Car & Foundry Company, testified as an expert for the plaintiffs. He prepared from defendant's drawings, a model of the transformer installation, which was used at the trial. In answer to hypothetical questions he testified that the blue flame seen about 1 o'clock in the morning, around the bolt securing the transformer platform to the north pole of the structure, would indicate very clearly that there was a leak of high-tension current, running from the transformer platform through the bolt into the pole, which leak came from the transformer; that such a flame must of necessity be due to a leak on the transformer platform, as that would be the only possible source of a leak causing fire around the bolt in question; that a leak of current from the fuse cut-out and member, during a rainstorm, would pass directly down the pole to the ground, and it could not cause any electrical leak on the transformer platform, nor leak onto it, and fire around the bolt supporting the transformer platform positively could not be caused by the leaking fuse plug; that blue flame appearing around the wooden members supporting the transformers, would be due to a leak in the transformer; that on a transformer installation illustrated by the model and drawing, with a transformer leaking, in dry weather the leak would be slight and not apparent, because the wooden structure was comparatively a good insulator; subjected to a rainstorm, however, such as shown by the evidence, it would become wet and the structure would then become a very good conductor, and electricity would flow on it, and then a leak, which had had no effect while the structure was dry, would manifest itself, and in flowing over the structure charge it with electricity and cause a fire, as the heat of the electricity would dry the wood in the path through which it was leaking, and after the wood was sufficiently dry it would char, and when the charring had advanced sufficiently for it to become a good conductor, the current would set fire to the wood. He stated that cutting out the fuse plug and putting on a jumper would not correct a leaking transformer. He further testified that the reason the flame disappeared when the fuse plug was pulled, was due to the fact that with the fuse plug in, the north transformer was getting a full load, namely, 2,300 volts, but upon pulling the fuse plug, its voltage was reduced, and the intensity of the current being thus materially reduced, the flame would disappear until it had been re-established at the lower voltage; that it would require a longer time for the lower voltage to produce the flame than the higher. This reduction in voltage is due to the fact that when the fuse plug was pulled over one transformer in a closed delta connection, that transformer being deprived of its primary source of high-tension current, got its current through the other two transformers, and the voltage was reduced in overcoming the resistance of this longer path before reaching the first transformer; that the passage of current is in inverse proportion to the resistance. After the jumper was put on, full current was restored to the north transformer, and the leak from the transformer would have a voltage of 2,300 volts, but would not immediately become visible, because during the time which elapsed from the time Dreams pulled the fuse plug until the repair men had completed the work of applying the jumper, the leaking current from the transformer would be reduced, and the wood would not dry so rapidly and the rain would saturate it with water. With the transformer resting on a horizontal platform, in a heavy rain the water would not run off readily, but would remain on top of the platform, and water being a good conductor, the current would pass through the water and not be visible. Should the source of supply of water diminish, such as the rain stopping, the heat of the current in its passage would dry the path in the wood and char the wood and set it afire. A leak from a transformer on a rainy night, where the voltage was 2,300, would burn wood, and an electrical leak sufficient to cause an electrical flame would ignite a wooden structure such as that in question. He also testified that he knew from actual experience that a current of 2,300 volts leaking from a transformer, would set such a structure afire. He also stated that in electrical men's parlance, a leaking transformer is called a "shot" transformer; that the term "shot" as applied to a transformer, means that it is not a perfect piece of ap

paratus, but does not necessarily mean that it is absolutely blown out or burned out. A transformer with an open circuit, or the primary and secondary coils in contact with the case, or something happening to the insulation of the transformer, permitting a leakage of current, would be termed a "shot" transformer. Osborne and Tucker both testified that if the transformer was grounded and it leaked, nothing would occur, and there could not have been a fire.

Plaintiffs' evidence showed that the amount of the loss of lumber, caused by the fire, was $112,845.68; that the value of the blow pipe system installed in the plant and destroyed by the fire was $5,500; that the value of the buildings destroyed was $14,000; and that the value of the machinery destroyed was $60,000.

From this testimony, it fairly appears that the fire started at this transformer platform; that it was caused by the leaking of electricity upon the platform from a defective or leaking transformer; that the fire was carried from the transformer platform to the lumber plant by means of a strong wind and the secondary wires; that the defective condition of the transformer was known to defendant's foreman, who stated a short time before the fire that the transformer was "shot," which meant that it was leaking or otherwise defective, and that he would return the next morning and fix it; that the defendant might have prevented the fire had it put a ground wire on the transformer case; and with the knowledge of the danger arising from the defective condition of the transformer, ordinary care would require the defendant, if necessary to prevent this fire, to turn off the current from this unit, and that the placing of a jumper around the fuse plug would not remove the danger arising from the leaking transformer, and was not the exercise of proper care to maintain these dangerous appliances in reasonably safe condition.

To be sure, there was a sharp conflict in the testimony, and on behalf of the defendant it was shown that the appliance known as the three-phase motor, the purpose of which was to record the electrical current and indicate any breaks therein, reflected no disturbance or break in the current of the lumber company's circuit, feeding at the transformer bank; and the testimony of the defendant was to the effect that if the transformer had been "shot" this condition would have been reflected by the three-phase motor. In this connection it is to be observed that the witnesses for the defendant did not agree with the witnesses for the plaintiffs as to what was implied by the term "shot." It was the claim of the witnesses for the defendant that a "shot" transformer meant a blown out or burned out transformer. There is nothing in the evidence to indicate that the transformer, if leaking, would cause the circuit breaker to act. The fact that the three-phase motor started and operated in the plant, would not, as a physical or scientific fact, prove that there was no leakage in the transformers, but only that there was not sufficient leakage to prevent the starting and operating of the three-phase motor. There was also testimony that the lights flickered and went out in the plant after the jumper was installed, and that the blue flame recurred after a time, and that the delay in its recurrence was explained by the testimony of the witness Osborne, which we must assume the jury believed. It is urged too that certain other scientific facts showed that there was no leakage in the transformer. It is claimed by the appellant that workmen adjacent to the transformer were not killed or injured, but the testimony warranted the jury in believing that these workmen were protected by rubber gloves and boots. The testimony was ample to warrant the jury in believing that the fire started at the bank of transformers. With this proof unexplained, under the instructions of the court, the jury were warranted in assuming that the fire was caused by the negligence of the defendant. This presumption was not met by the mere proof that the appliances originally selected and installed were those of standard make and in general use, and there was no evidence showing inspection and tests at regular intervals in order to prevent such an occurrence. It was not only the duty of the defendant to exercise proper care in the installation of its instrumentalities, but it was also its duty to exercise such care in the maintenance thereof as was proportionate to the danger in their use. This might require such inspection as would detect defects when occurring, and this duty was a continuing one.

In the instant case, the positive evidence warranted the jury in believing that the defendant knew of the defective condition of one of these transformers prior to the time of the fire, and warranted the jury in finding that the defendant did not exercise ordinary care in repairing or adjusting the defect, or in turning off the current on this unit, so as to prevent the danger of fire. Under the facts, the doctrine of res ipsa loquitur

690

was properly invoked. San Juan Light & Transit Co. v. Requena, 224 U. S. 89, 32 S. Ct. 399, 56 L. Ed. 680; Memphis Consolidated Gas & Electric Co. v. Letson (C. C. A.) 135 F. 969; Dierks Lumber & Coal Co. v. Brown (C. C. A.) 19 F.(2d) 732; Silva v. Northern California Power Co., 32 Cal. App. 139, 162 P. 412.

▮ Aside from this doctrine, we think the evidence was sufficient to prove that the negligence of the defendant in the maintenance of these electrical appliances was the proximate cause of the fire. At the time the fire was first discovered there was no fire except at these transformers and on the eaves of the adjoining building, toward which the wind was blowing. The fire observed was a blue flame, showing that it was of electrical origin. The blaze could not, at the time it was first observed in this equipment, have jumped from the building against the wind and set fire to the wet wood on defendant's equipment at the transformer bank. This would seem to have been both a scientific and a physical impossibility.

▮▮ It is, however, urged that inasmuch as this court reversed a prior judgment on the ground of insufficiency of the evidence, and the evidence now produced being substantially the same as that which was heretofore held to be insufficient, we are bound again to reverse the case. Conceding the correctness of the principle of law invoked, we are clearly of the view that the evidence now before the court is substantially different in very many vital particulars from that reviewed by this court on the former appeal. The evidence in the record clearly points to the source of the fire, as well as to what caused it. It would unduly extend this opinion to point out the various items of testimony differing from or in addition to that presented on the former appeal. The argument of appellant is convincing that there is much of such testimony. By way of illustration, the witness Osborne testified as follows: "The leak on that transformer platform could not occur from the leakage in the fuse block above the transformer. It would be evident that the transformer was leaking; otherwise, the current could not leak onto the transformer platform from the grounded fuse block."

Counsel for appellant, in referring to this testimony, say: "This testimony not only invaded the province of the jury and was for that reason incompetent, but was, in addition, a direct change from the testimony of the

witness given on the first trial of this case in the Federal Court."

Counsel further say: "On the trial from which this appeal is taken, it will be noted that this expert flatly denied that the leak or a blue flame at midnight could have come from the fuse block, and positively stated that it would be evidence that the transformer was leaking. We submit that this change of testimony could have but one purpose, etc."

On the question of the origin of the fire at 6 o'clock a. m., there was the direct and positive testimony of Royals, Dreams, Avra, Barton, Allen Hayes, and Frank Hayes, above quoted, but little of which was before the court on the former appeal. It will not be necessary to re-state this testimony here.

It is argued, however, that this additional evidence or change in the testimony is not credible, and that it has the effect of contradicting what the various witnesses testified on the former trial. But a number of these witnesses did not testify at the former trial. The testimony was of such character as to convince the jury, and we may not pass upon its weight or credibility. We can only determine whether or not it was substantial.

A careful study of the whole evidence satisfies that the issue was one that could not be determined as a matter of law. There were no physical nor demonstrated facts or scientific principles from which it could be said that the plaintiffs' contention could not be true (Conner v. Ry. Co., 181 Mo. 397, 81 S. W. 145; Solomon v. Moberly Light & Power Co., 303 Mo. 622, 262 S. W. 367; Eastern Oklahoma Light & Power Co. v. Hare, 142 Okl. 283, 286 P. 769; Derrick v. Hardwood Electric Co., 268 Pa. 136, 111 A. 48; Silva v. Northern California Power Co., 32 Cal. App. 139, 162 P. 412; Staunton Mutual Telephone Co. v. Buchanan, 108 Va. 810, 62 S. E. 928; Newman v. Great Shoshone & Twin Falls Water Power Co., 28 Idaho, 764, 156 P. 111; Reynold v. Narragansett Electric Lighting Co., 26 R. I. 457, 59 A. 393); at least, reasonable men might well have reached different conclusions therefrom. The plaintiffs developed a theory upon which the actionable negligence of the power company was predicated, and that theory was supported by tangible and substantial evidence.

▮ It is urged that a verdict should have been directed for the defendant because some seventeen insurance companies who had paid insurance losses to the plaintiffs on account

of this fire, were not made parties plaintiff. The legal title to the cause of action remained in the insured. Whatever right the insurance companies acquired by reason of having paid fire losses was derived through the insurance alone, under the principle of subrogation. The cause of action in the instant case was based upon tort and was a single cause of action. Under the Missouri practice, it has been repeatedly held that wherever an insurance company has indemnified the owner for the loss of property destroyed by fire, the action to recover from the tort feasor should, nevertheless, be brought in the name of the owner. Swift & Co. v. Wabash R. Co., 149 Mo. App. 526, 131 S. W. 124; Sexton v. Anderson Electric Co. (Mo. App.) 234 S. W. 358; Mathews v. Ry. Co., 121 Mo. 298, 24 S. W. 591, 25 L. R. A. 161; Dillon v. Hunt, 105 Mo. 154, 16 S. W. 516, 24 Am. St. Rep. 374; United States v. American Tobacco Co., 166 U. S. 468, 17 S. Ct. 619, 41 L. Ed. 1081.

 The petition claimed damages in the sum of $250,000. The insurers paid far less than the claimed loss, and while the verdict in this case was for $100,000, it is clear that a verdict for a loss far in excess of that sum, or in excess of the amount of the fire loss paid by the insurance companies, would have been sustained, so far as the value of the property destroyed is concerned. It is generally held that the insured, at least where the loss is greater than the insurance paid, may maintain the action, and it is no concern of the wrongdoer how the proceeds may be apportioned. Norwich Union Fire Ins. Society v. Standard Oil Co. (C. C. A.) 59 F. 984; Federal Ins. Co. v. Detroit Fire & Marine Ins. Co. (C. C. A.) 202 F. 648.

 It remains to consider the contention that the court erred in its instructions. The court instructed the jury that: "The fact that a surface leak or a blue flame, as it was described, was seen on one of the poles supporting the transformers and fuse cut-outs several hours before the fire which destroyed the lumber yard occurred, does not, of itself, constitute sufficient proof that the fire which destroyed the lumber yard was the result of negligence on the part of the defendant, and the mere fact that such a surface leak was seen several hours before the fire would not, of itself, be sufficient evidence to warrant you in returning a verdict for the plaintiff, but you may consider the circumstance of the appearance of the blue flame several hours before the fire, in connection with all of the other evidence in the case."

In assailing this instruction, counsel complain that the court, by this instruction, led the jury to believe that the appearance of a flame on one of the poles supporting the fuse cut-out several hours before the fire while not conclusive evidence, was some evidence of negligence. In criticizing this instruction, counsel say: "The appellant, through its agents and employees, had made such alterations or repairs in its said fuse cut-out as would render the recurrence of such flame from the same cause impossible."

Of course, if this statement of counsel should be accepted as a verity, their conclusion would doubtless be inevitable. The record, however, does not warrant the assertion that the repairs made rendered a recurrence of this flame impossible; in fact, there is positive testimony in the record to the contrary. It is also urged that the instruction permitted the jury to speculate and to pyramid inference upon inference, but there was positive proof that there was a blue flame at the bolt supporting the transformer platform. There was evidence that the fire at the bolt could not have arisen, except by reason of a defective transformer. These are not inferences. There was also testimony that what was done by the defendant did not cure the defect, and there was direct testimony based upon scientific principles, that the transformer was leaking. There was direct testimony that it was raining; that the transformer was wet; that wood is a conductor of electricity when wet; that there was a blue flame at six o'clock in the morning; and that the fire was discovered just leading into the eaves of the building from this transformer device. The circumstances are either established by direct proof or scientific fact, and not by inference, as counsel seem to believe. Obviously, this earlier blue flame showed a defect in connection with the transformer unit, and was a very material circumstance in the entire evidence, and had a direct bearing upon the ultimate fact to be determined by the jury. There was no error in this part of the court's instructions. Neither was there any error in the other instructions complained of. A number of instructions were requested by the defendant. Some of these should clearly not have been given, and such as were proper were given in substance in the court's charge. Most of these requests were subtle attempts to escape from the res ipsa loquitur doctrine, upon which the case was tried. There was no error in their refusal.

The judgment appealed from is therefore affirmed.