WILLIAM P. LUNDAY, CHARLES A. LUNDAY, JR. *v.*
FRED TOENEBOEHN & LEE TOENEBOEHN

73-83                                               499 S.W. 2d 602

Opinion delivered October 1, 1973

*Kenneth R. Smith,* for appellants.

*Buford M. Gardner, Jr.,* for appellees.

CONLEY BYRD, Justice. Appellants William P. Lunday and Charles A. Lunday, Jr. brought this action to determine what interest Mrs. Charles A. Lunday, Sr. was claiming in the property. After appellees Fred Toeneboehn and wife intervened they amended the complaint, to set aside, as a forgery, a deed allegedly executed by their Father Charles A. Lunday, Sr. and Bessie B. Lunday, his wife to Fred E. Toeneboehn and Lee Toeneboehn. To reverse the decree in favor of the Toeneboehns, appellants contend that the findings of the trial court are against a clear preponderance of the evidence.

The proof shows that Charles A. Lunday, Sr. had suffered some strokes. He married Bessie B. Lunday on February 14, 1970, and died on November 11, 1970. Sometime in September Mr. Lunday and Mr. Toeneboehn went to the office of appellants' counsel for the purpose of conveying the lands here involved. At that time Mr. Lunday seemed to think he was the sole owner and intended to sell the whole subdivision for $10,000. Appellants' counsel at that time informed Mr. Lunday that he was only a joint tenant with his son Charles A.

Lunday, Jr. As a result of that conversation the lawyer prepared two deeds, one for the son and his wife and one for Mr. and Mrs. Lunday. On September 21st the deed in question was allegedly executed and delivered. However, subsequent thereto and before he went to the hospital and suffered his stroke on September 27th, Mr. Lunday moved his mobile home to the lands with the intention of making it his home. Mr. Lunday did not recover consciousness after his stroke which occurred shortly after he entered the hospital.

With reference to the transaction at Toeneboehn's house, Bessie B. Lunday testified that she and Mr. Lunday went to Toeneboehn's house in an automobile driven by Mr. Lunday. She says that while there she saw Mr. Lunday sign the deed and a receipt for $5,000 which she saw Mr. Toeneboehn pay to Mr. Lunday. Thereafter, they went to the notary's office where the deed was acknowledged. She also identified a number of checks signed by Mr. Lunday, some as late as June 24, 1970. After testifying that she saw Mr. Toeneboehn pay the $5,000 to Mr. Lunday and that she did not know what Mr. Lunday did with the money, the following occurred:

"THE COURT: Well, what did he do with it there in your presence:

A. I don't know what happened, I still don't know. He went into the hospital on a Monday and I still don't know where the money went.

THE COURT: You were at the Toeneboehn's home when the money was paid and the deed was made?

A. Yes, sir.

THE COURT: How did you travel to the Toeneboehn's home?

A. How did we go there — in Charley Lunday's car.

THE COURT: Who drove it?

A. He did.

THE COURT: Did you see whether he put it in his pocket or just what?

A. I don't know what he did with it. I never seen it.

THE COURT: You never did see the money?

A. I never seen what he did with it.

THE COURT: Just tell the Court what you did see happen with reference to the money, who handed it to him?

A. Fred handed it to him.

THE COURT: Right there in your presence?

A. That is right.

The COURT: What did you see then happened to it?

A. I never seen anything happen to it.

THE COURT: Did he go around holding the money in his hands the rest of the day?

A. I don't know.

THE COURT: You never did see—did you black out then?

A. I guess I did.

THE COURT: How did you get back home?

A. I went in the car.

THE COURT: Who drove it?

A. He did.

THE COURT: Did he have the money in his hands then?

A. I never seen what he had—what he did with the money.

THE COURT: You never did see what he did with the money?

A. No."

With reference to her rights in the property after the conveyance to Toeneboehn the record shows the following:

"Q. Do you and Mr. Toeneboehn have some sort of an arrangement or agreement on this property?

A. Do we?

Q. Yes.

A. Well, not that I know of. He said it would be alright for me to stay there, have my trailer there.

Q. You don't have any agreement with him concerning the lot or part of part of this property?

A. Well, he didn't know for sure.

Q. Does it depend upon what happens, whether he gets the property?

A. That is right, I guess that is so. If he doesn't get it, I don't stay, I guess.

Q. But if he does get it, you get to stay there?

A. I think so."

Fred Toeneboehn testified that he saw Charles Lunday, Sr. sign the deed in his home; that they then went to the Kansas Savings and Loan where Mr. and Mrs. Lunday acknowledged the deed, and the receipt for the $5,000 was typed by a girl in the bank; and that upon the return to his home he paid the $5,000 in cash, and Mr. and Mrs. Lunday signed the receipt. Nothwithstanding, that he says he paid $5,000 for the deed he testified that

he only placed revenue stamps thereon for a $1,500 consideration.

James L. Lewis, a questioned document examiner, testified that after a comparison of the name signed to the deed and the receipt with acknowledged signatures of Mr. Lunday, the alleged signatures on the deed and receipt were a forgery.

Myra B. Gross, a Notary Public of Wyandotte County, in the State of Kansas, stated that she was not acquainted with Mr. and Mrs. Charles A. Lunday, Sr. prior to the time she took the acknowledgment. Her testimony as to what occurred at that time is as follows:

"On or about September 21, 1970, Mr. Kerr, President, Investors Mortgage Bankers, Inc. called me to his desk where Mr. Fred Toeneboehn was present, and I was introduced to Mr. and Mrs. Charles Lunday. Mr. Kerr informed me that the Lundays were selling a parcel of real estate to Mr. and Mrs. Fred Toeneboehn with a prepared deed bearing signatures of Charles Lunday, Sr. and Bessie Maze Lunday. Mr. Kerr advised the parties that the deed should not have been signed except in our presence and questioned each of the Lundays if their signature appearing on the deed was affixed by them and each of them stated that they had signed the deed. Upon their statement before Mr. Kerr, Mr. Toeneboehn, and me, that their signatures were genuine, the Notary Seal was affixed."

Robert S. Kerr, President, Investors Mortgage Bankers, Inc., Roeland Park, Kansas, after testifying that Toeneboehn had, before Sept. 21, 1970, consulted with him relative to the procedure for transferring title to property, stated that he was not acquainted with Mr. and Mrs. Charles A. Lunday, Sr. prior to the transaction. He then stated:

"On or about September 21, 1970, Mr. Toeneboehn and the Lundays appeared in my office and presented a deed to a parcel of land which was completed to the inclusion of signatures. Since signatures were

> already affixed, I called Mrs. Myra Gross, a Notary Public in my office, to my desk, and in her presence, asked the Lundays, individually, if the signature appearing on the deed was that placed there by each of them, and in both instances the reply was affirmative.
>
> With both parties appearing to be in full awareness that they were transferring the title to property to the Toeneboehns and attesting to the genuineness of their signatures, the Notary Seal was affixed."

Upon the testimony and the exhibits in the record we can only conclude that the signatures of Charles A. Lunday, Sr. to the deed and the receipt are a forgery. In fact it is rather obvious. The trial court intimated as much but seemed to think that appellants had not sustained their burden of proving that no consideration was paid and that the acknowledgment before the notary was a ratification of the signature. It was here that the chancellor fell into error. In the first place the notary only stated that Toeneboehn told her that the persons who acknowledged the deeds were Mr. and Mrs. Lunday. In the next place the learned chancellor failed to apply the law of fabricated evidence to the record before him.

It is pointed out by the authorities that the fabrication of evidence raises a strong presumption against those who have recourse to such practices. See *Winchell, et al* v. *Edwards, et al*, 57 Ill. 41 (1870), and *Silva* v. *Northern California Power Co.*, 32 Cal. App. 139, 162 P. 412 (1916).

The credibility of both Toeneboehn and Mrs. Lunday is subject to suspicion since they testified positively that Mr. Lunday signed both the deed and the receipt, and a great preponderance of the evidence shows both instruments to be forgeries. Thus, when the record is considered under the fabrication of evidence rule, we find that a preponderance of the evidence shows that the deed should be set aside for forgery.

Reversed and remanded.